[No. 43721.   En Banc.   January 7, 1977.]

THE STATE OF WASHINGTON, *Respondent,* v. HAROLD BERNARD SMITH, *Petitioner.*

*J. Dean Morgan, Michael H. Hicks,* and *Jackson H. Welch* of *Clark County Legal Defender,* for petitioner.

*James E. Carty, Prosecuting Attorney, George O. Darkenwald, Chief Criminal Deputy,* and *Dennis M. Hunter* and *Sharon Howard, Deputies,* for respondent.

WRIGHT, J.—Appellant Harold Bernard Smith was convicted of first–degree murder in the Superior Court for Clark County. The Court of Appeals determined that only

three issues raised on appeal warranted any detailed consideration and discussion: (1) whether the seizure of Smith's clothes without a warrant when he was a patient in a hospital security room, plus admitting the clothes into the trial evidence against him, violated state (Const. art. 1, § 7) and federal (U.S. Const. amend. 4) constitutional prohibition against *unreasonable* searches and seizures; (2) whether the State established a prima facie case of the corpus delicti; and (3) whether the verdict was supported by substantial evidence. The Court of Appeals found no merit in appellant's contentions and affirmed his conviction of first–degree murder. *State v. Smith,* 12 Wn. App. 720, 531 P.2d 843 (1975).

We granted a petition for review essentially to consider only the first of the three issues referred to above. We hold that the seizure of the clothes was reasonable and constitutional and that they were properly admissible in evidence. We agree entirely with the decision of the Court of Appeals that the two other issues raised by appellant are without merit. Thus, we affirm the Court of Appeals and the trial court.

To put the issue regarding the seizure and the evidentiary use of appellant's clothes in proper perspective, a detailed and even somewhat lengthy statement of facts seems appropriate and should be helpful at this point.

Around midnight on July 30, 1972, appellant Harold Bernard Smith left his home with his 2 1/2–year–old son, purportedly to go for a walk. The child had been dressed for bed by his mother and was wearing only his pajama tops and training pants, but apparently had a small blanket around him. The Smiths lived in a somewhat secluded area on the outskirts of Vancouver on some bottomland traversed by a small creek located roughly a distance of some 75 to 100 yards from the Smith home. Kathleen Smith, appellant's wife and the mother of the small boy, went to sleep shortly after the father left the home with the child. She awakened at 6:15 a.m. and was unable to find her husband or their son in or immediately around the residence.

Appellant Smith returned to the home at approximately 7:15 a.m. without his son. The mother asked where the boy was. Appellant told her, "He is, he is up on the hill in someone's car." When questioned further, he told the mother that the boy was "In a friend's car," and she should not worry.

Shortly thereafter, appellant for some unknown reason left the house again and walked toward a bridge that, at a point near the house, spanned the small creek. Kathleen Smith became concerned about her husband's strange conduct and the missing child. The Smiths had no telephone, so Kathleen went to the neighbors where she telephoned her husband's parents and told them about the missing boy and their son's unusual conduct. She then returned to the house and told her husband she had tried to call his parents but could not reach them. She was afraid appellant would leave if he was told the parents had been called and were coming to the house. When Kathleen asked again as to their son's whereabouts, appellant was evasive. Shortly thereafter, his parents arrived. The father asked where the boy was, and appellant responded, "I think he fell in the creek." The father then asked appellant if he tried to get him out. Appellant responded that, "He tried, but he couldn't." The parents then took their son to the hospital. He was checked in at the emergency room;[1] the emergency room contacted a doctor who ordered appellant confined in one of the security rooms of the hospital.

The parents of appellant contacted the Vancouver City Police Department which in turn contacted the county sheriff's office. The parents then returned to the home where the mother, Kathleen Smith, had been left. When several city police and sheriff's deputies arrived, they found Kathleen Smith walking back and forth in front of the home, hysterical and screaming. In talking with Deputy

---

[1]During the admission procedure, appellant requested Mrs. Odegard, a nurse's assistant, to give him a cup of coffee and appellant told her, "'I think I drowned my own son, but I don't remember.'"

Sheriff Lentz, Kathleen Smith told him that her husband, earlier in the morning, was hysterical and distraught and, when questioned about their son, had said, "He's in the creek. I put him in the creek." Kathleen Smith and appellant's parents also told Deputy Sheriff Lentz that the appellant's pants, earlier that morning, "were wet from the knees down and had sand and mud on them." Appellant's parents took over the care of the younger child in the Smith home while several police and sheriff's deputies, as well as the mother, Kathleen, began a search outside the house for the missing child. Apparently the searchers fanned out in several directions, with the mother proceeding towards the creek. Shortly thereafter, Deputy Lentz and others heard the mother screaming. They found her in an open field about 50 feet from the creek sitting on the ground crying and screaming with the little boy in her arms. She had found him in the creek. Deputy Lentz immediately determined that the youngster was dead, apparently from drowning in the creek.

Deputy Sheriff Lentz observed that access to the creek was extremely difficult because at the place where the mother had found the child it was surrounded by heavy underbrush, stickers, and brambles. He also observed that there were no scratches on the victim's legs, and from this concluded that the child had not gone to the creek voluntarily and under his own power but had been taken there by someone else. The creek at that point was about 5 feet in width, its depth at the center varied from about 8 to 12 inches, and at the edges or banks was approximately zero. Appellant's belt was found on one bank of the creek adjacent to the place where the child's body was found in the creek. Also at this locale on the bank near the edge of the creek, there was an indentation where someone had sat down. The indentation had marks approximating those that could have been made by the corduroy pants worn by appellant. An ambulance was called, the child was taken to the hospital and was pronounced dead upon arrival. The subsequent autopsy indicated death by drowning and

strangulation from water and sand. The autopsy revealed recent scratch marks on the boy's neck, bruises on the side of his head, a cut on his lips and apparently older bruises on the buttocks.

When he realized the child had drowned under such singularly suspicious circumstances, Deputy Lentz wasted no time. He proceeded, actually, in hot pursuit of appellant as the most likely suspect, going directly to the hospital in an effort to see, examine, and possibly take possession of appellant's wet, sandy, and muddy clothing for use as evidence. At the emergency room, he was directed to the third floor where he talked with Mrs. Walker who was employed by the hospital as a ward clerk. Deputy Lentz questioned her about the whereabouts of appellant and his clothes and the two went to the location of a "security" room on the third floor where the appellant had been placed in hospital security pursuant to the orders of his doctor. Mrs. Walker had put appellant's clothes in a closet in an anteroom or entryway which led from a public hallway of the hospital to the security room occupied by appellant. The security room was separated from the anteroom or entryway by a door equipped with a lock. The door had a glass window for viewing the inside of the security room. The anteroom or entryway to the security room was semipublic. It was equipped with a sink or washbasin and was open and accessible to doctors and nurses who frequently used the sink to wash their hands.

The ward clerk made a list of appellant's clothes. This was signed as a receipt by Deputy Lentz who then took the clothes to the sheriff's office where they were put in plastic bags for safekeeping as evidence. Subsequently, samples of sand taken from appellant's clothes, from the young victim's clothes, and from the center of the creek were analyzed by the Federal Bureau of Investigation's laboratory and found to be comparable.

In the trial court, defense counsel argued that the state and federal constitutional prohibitions against "unreasonable searches and seizures" were applicable to the seizure of

the clothes and moved to suppress and exclude appellant's clothes as evidence. The motion was denied by the trial court. Claims of error regarding denial of the motion will now be considered.

■ It is apparent that the fourth amendment to the United States Constitution and article 1, section 7 of the Washington State Constitution are comparable and are to be given comparable constitutional interpretation and effect. Accordingly, in this opinion, reference will be made only to the Fourth Amendment.

It is well settled and no authority is required for the proposition that the Fourth Amendment prohibits *only* *"unreasonable searches and seizures."* The prohibition is cast in unquestionably general rather then in explicit and clearly definitive language. It reads:

> The right of the people to be secure in their persons, houses, papers, and effects, against *unreasonable searches and seizures,* shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

(Italics ours.)

■ To the practiced eye of a legal draftsman, it should be apparent that the amendment is phrased in general constitutional language rather than in the more detailed, definitive, and often more lengthy idiom or technique common to legislative drafting and enactment. The difference in the technique of drafting and the choice of language is, of course, appropriate and traditional in the formulation and writing of constitutional provisions. This probably is just another way of saying that judicial interpretation is both necessary and appropriate to give meaning, content, and legal effect to the very general, constitutional language used in the Fourth Amendment. Thus, while it is clear that the Fourth Amendment prohibits only *unreasonable searches and seizures,* there is no definitive or elaborative language as to what kind of searches and seizures are either

*unreasonable* or *reasonable.* Force and effect as to the constitutional prohibition must be given or withheld through the process of judicial review and interpretation, which has been the name of the game at least since *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L. Ed. 60 (1803).

The minimal detail and definition in the drafting of the Fourth Amendment has generated problems of interpretation of considerable scope and significance. The task of filling in the details and definitions is not lessened or resolved but is more understandable and perhaps more acceptable when the necessity and the propriety of judicial review (*i.e.,* interpretation and application of the constitutional language) is forthrightly and realistically recognized and emphasized. In this respect, it may be said—somewhat tangentially—that it is a disservice to think of constitutional interpretation solely as a mystical discovery or law–finding process known and practiced only by judges. Certainly it is not a process of unerring, absolute, and right perception of constitutional meaning *available only to judges of appellate courts.* Frequently, the process or function is in fact one of trial and error involving a balancing or weighing of competing values, and the making of value judgments. These often concern the rights and security of the individual versus or vis–a–vis the rights and security of society. The value judgments may have subjective as well as objective facets or connotations. In addition, the process is dependent upon and subject to the availability, recognition, and interpretation of the "so–called" facts and circumstances in each individual case as perceived by an appellate court majority at a given time and place. In litigated cases in our present order of things, an appellate court majority simply has the last say and the Supreme Court, of course, has the final say.

Largely for the reasons indicated, the Fourth Amendment has produced a great plethora of United States Supreme Court and other appellate court opinions. Some of these opinions have been consistent; others inconsistent; some have qualified and overruled others.

A quick review of several relevant decisions of the United States Supreme Court from *Weeks v. United States,* 232 U.S. 383, 58 L. Ed. 652, 34 S. Ct. 341 (1914)(involving a dictum regarding unlawful searches and seizures)—including but not limited to *Rios v. United States,* 364 U.S. 253, 4 L. Ed. 2d 1688, 80 S. Ct. 1431 (1960); *Katz v. United States,* 389 U.S. 347, 19 L. Ed. 2d 576, 88 S. Ct. 507 (1967); *Chimel v. California,* 395 U.S. 752, 23 L. Ed. 2d 685, 89 S. Ct. 2034 (1969); *Coolidge v. New Hampshire,* 403 U.S. 443, 29 L. Ed. 2d 564, 91 S. Ct. 2022 (1971); and *United States v. Watson,* 423 U.S. 411, 46 L. Ed. 2d 598, 96 S. Ct. 820 (1976), truly indicates the rule as to these matters is not entirely clear.

The cases do establish the general principle that warrantless searches and seizures are not necessarily unconstitutional, illegal, or void. It is said that they are prima facie suspect, or, as it is sometimes stated, *warrantless* searches and seizures are per se unreasonable unless they fall within specifically established and well–delineated exceptions to the rule. *Katz v. United States, supra; Coolidge v. New Hampshire, supra.* Decisions of the Supreme Court clearly emphasize an overriding principle or rule, the desirability— *if not the necessity*—for police officers to obtain search warrants *unless they are confronted by emergencies and exigencies* which do not permit reasonable time and delay for a judicial officer to evaluate and act upon probable cause applications for warrants by police officers. *Trupiano v. United States,* 334 U.S. 699, 92 L. Ed. 1663, 68 S. Ct. 1229 (1948).

It is well settled that a search and seizure without a warrant may be constitutionally valid *if incidental to a lawful arrest, i.e.,* an arrest (1) based on a valid warrant, or (2) based only on probable cause. *United States v. Watson, supra.* Apparently the search and seizure still cannot be a wide–ranging, exploratory, rummaging, ransacking one, but must be restricted in time and place in relation to the arrestee and the arrest. *Chimel v. California, supra.*

With the focus of *Watson* on the existence of probable cause, the emphasis in *Trupiano* and in previous cases on whether there was a reasonable opportunity to obtain a search warrant from a judicial officer now may be diminishing.

The decision of the Supreme Court in *United States v. Watson, supra,* is an interesting, and seems to be a significant, development or shift in the law respecting the interpretation, meaning, and effect to be given to the Fourth Amendment by the courts. On the basis of information from a very reliable informant, Watson was arrested without a warrant in a public restaurant. The question faced and decided by a majority of the court was whether such a warrantless arrest *in a public restaurant* can be valid and not in violation of the Fourth Amendment, *when based only on probable cause without any showing of exigent circumstances.* The majority opinion by Mr. Justice White answers the question in the affirmative. In part, it states:

> *The necessary inquiry, therefore, was not whether there was a warrant or whether there was time to get one, but whether there was probable cause for the arrest. . . .* Just last Term, while recognizing that maximum protection of individual rights could be assured *by requiring a magistrate's review of the factual justification prior to any arrest, we stated that* "such a requirement would constitute an intolerable handicap for legitimate law enforcement" and noted that the Court "has never invalidated an arrest supported by probable cause solely because the officers failed to secure a warrant." *Gerstein* v. *Pugh,* 420 U. S. 103, 113 [43 L. Ed. 2d 54, 95 S. Ct. 854] (1975).
>
> . . .
> . . . *Congress has plainly decided against conditioning warrantless arrest power on proof of exigent circumstances.* Law enforcement officers may find it wise to seek arrest warrants where practicable to do so, and their judgments about probable cause may be more readily accepted where backed by a warrant issued by a magistrate. See *United States* v. *Ventresca,* 380 U. S. 102, 106 [13 L. Ed. 2d 684, 855 S. Ct. 741] (1965); *Aguilar* v. *Texas,* 378 U. S. 108, 111 [12 L. Ed. 2d 723, 84 S. Ct.

1509] (1964); *Wong Sun* v. *United States,* 371 U. S. 471, 479–80 [9 L. Ed. 2d 441, 83 S. Ct. 407] (1963). *But we decline to transform this judicial preference into a constitutional rule when the judgment of the Nation and Congress has for so long been to authorize warrantless public arrests on probable cause rather than to encumber criminal prosecutions with endless litigation with respect to the existence of exigent circumstances, whether it was practicable to get a warrant, whether the suspect was about to flee, and the like.*

(Footnotes omitted. Italics ours.) *United States v. Watson, supra* at 417–18, 423–24.

It must be recognized that the *Watson* decision involved a warrantless arrest, *i.e.,* a seizure of the person, not a warrantless seizure of evidence, and secondly, that the warrantless arrest occurred in a restaurant not in a private home or residence.

The majority opinion by Mr. Justice White in *Watson* would support an intriguing and persuasive conjecture that the formula there adopted—probable cause—for validation of warrantless arrests in a public place also would apply to and validate warrantless searches and seizures respecting incriminating evidence in a public place. Based on the premise that arrest or seizure of a person seems a more serious, at least a more direct, interference with his freedom and liberty than the seizure of any personal effects as evidence of criminality, logic would seem to support application of the rationale of the *Watson* majority opinion to the seizure of evidence. However, the majority opinion in *Watson* is concurred in without comment only by Justices Rehnquist, Blackmun, and Chief Justice Burger. Justices Stewart and Powell concur in separate opinions. The opinion by Justice Powell suggests a possible difference between (a) probable cause validating warrantless arrests and (b) probable cause validating warrantless searches and seizures relating to evidence.

Our analysis tends to indicate that the existence of probable cause coupled with the presence of emergent or

exigent circumstances regarding the security and acquisition of incriminating evidence, should be the controlling factors.

Incidentally, if a warrantless search and seizure is reasonably closely related in time and place to a lawful arrest, the search and seizure may be considered *incidental* to the arrest and, therefore, valid constitutionally whether the search and seizure occurs *either before or after the arrest. State v. Brooks,* 57 Wn.2d 422, 357 P.2d 735 (1960).

We have found no decision of the United States Supreme Court with a fact pattern identical, or so closely comparable, to that in the instant case to constitute controlling precedential case authority. Thus, we think the instant case is novel and perhaps *sui generis* as to both fact pattern and as to what interpretation and application of the Fourth Amendment would be appropriate under the circumstances.[2]

Substantially without a clear, precise, or even reasonably controlling precedent, we must to a large extent fashion our own evaluation and resolution of the Fourth Amendment problem in the instant case.

Considering the totality of the circumstances, we are convinced that Deputy Sheriff Lentz acted in a prudent, reasonable as well as an effective manner in obtaining the pants of the appellant for use as evidence of his complicity in the death of his young son by strangulation and drowning. What Deputy Lentz did was consistent with his role and function in our society as a well–trained, properly–disciplined police officer. It was good police work and should be characterized *only as a reasonable and constitutionally valid seizure of incriminating evidence.* We think

---

[2]We are well aware of the decision in *Morris v. Commonwealth,* 208 Va. 331, 157 S.E.2d 191 (1967). Although this case invalidated a warrantless seizure of a hospital patient's clothes on Fourth Amendment grounds, it is factually distinguishable. In *Morris,* no emergent, exigent, or in the court's own words, "exceptional" circumstances existed which could justify a warrantless seizure of the hospital patient's clothes. Due to its particular factual pattern, the reasoning in *Morris* is not persuasive and is not applicable to the unique facts found in the present case.

the instant case meets the requirements of the probable cause plus exigent circumstances formula suggested in several Supreme Court decisions. *Coolidge v. New Hampshire, supra; Vale v. Louisiana,* 399 U.S. 30, 26 L. Ed. 2d 409, 90 S. Ct. 1969 (1970); *Chimel v. California, supra; Warden v. Hayden,* 387 U.S. 294, 18 L. Ed. 2d 782, 87 S. Ct. 1642 (1967); *McDonald v. United States,* 335 U.S. 451, 93 L. Ed. 153, 69 S. Ct. 191 (1948).

The opinion of the Washington Court of Appeals, evaluating the problem in the instant case, states:

> We hold that where a patient in the hospital turns over his clothes to a representative of the hospital, such as a staff member, *and allows them to be placed in a common area outside the room to which he is assigned, he has relinquished exclusive control over them. The hospital, therefore, has at least joint control* and may consent to their search and seizure. The record in the case at bar established that doctors and nurses, as well as the ward clerk who actually obtained the clothes, had free access to the area for a variety of uses. Though the anteroom was the only connection between Smith's room and the hallway, it was considered more a part of the hall. In fact, it seems likely that it was used as a buffer between the security room and the outside. This evidence ʼwas not controverted and there was no evidence that Smith did not freely acquiesce in the placing of his clothes in a common area and having the door locked between him and his clothes. For all he knew they were being taken to a place in the hospital far from his room and open to anyone. Smith made no attempt to conceal his clothes from public scrutiny, as contrasted, for instance, to one who hands over to a shipper a sealed case as in *Corngold v. United States,* 367 F.2d 1 (9th Cir. 1966).

(Italics ours.) *State v. Smith,* 12 Wn. App. 720, 725, 531 P.2d 843 (1975).

■ We can agree that the hospital and the ward clerk— as stated by the Court of Appeals—*had at least joint control* of the appellant's clothes. Furthermore, it would seem plausible and reasonable to conclude that *joint control* of the clothes by the hospital was sufficient to allow the ward

clerk in the performance of her regular duties to turn them over to the deputy sheriff.

We think an even stonger case could be made to bolster and support the reasoning of the Court of Appeals. By his doctor's orders, appellant was placed in a security room of the hospital. He had little, if any, choice but to stay there until his doctor decided otherwise, and the hospital, ostensibly, would see to this. As a very practical matter, it is highly unlikely that appellant under the circumstances would have had any access to his clothes. Rather than joint control, the hospital and the ward clerk *practically had total control* of the clothes. The clothes were not in the security room nor were they in any other private, secluded, secure place. The appellant had done nothing to secure or secrete them. They were in a closet in an at least semipublic anteroom which also was open to and used generally at will by doctors, nurses, and other hospital employees. The decisions of the United States Supreme Court continue to declare that the primary purpose of the Fourth Amendment is to protect the privacy of an individual from arbitrary intrusions by government officials. *Katz v. United States,* 389 U.S. 347, 19 L. Ed. 2d 576, 88 S. Ct. 507 (1967); *United States v. Dionisio,* 410 U.S. 1, 35 L. Ed. 2d 67, 93 S. Ct. 764 (1973); *South Dakota v. Opperman,* 428 U.S. 364, 49 L. Ed. 2d 1000, 96 S. Ct. 3092 (1976) (Powell, J., concurring). Given these facts, appellant had no reasonable expectation of privacy in the physical condition of his clothes.

While we are in substantial agreement with the reasoning of the Court of Appeals, we think there are other convincing reasons to support the conclusion that Deputy Sheriff Lentz acted reasonably and not in violation of the Fourth Amendment in obtaining appellant's clothes at the hospital.

While investigating a report about a missing child with several other officers, Deputy Sheriff Lentz learned that appellant Smith, with his 2 1/2–year–old son had left the family home around midnight. The small boy was dressed in rather scanty nightclothes. Seven hours later, the next

morning around 7:15, the appellant, *without his son,* returned to the family home. When the mother inquired about the boy, the appellant was evasive. When questioned further, he told the mother that "He is, he is up on the hill in someone's car." The mother became concerned about the missing son and her husband's strange conduct. She called her husband's parents. They took appellant to the Vancouver Hospital where he was placed in a security room pursuant to doctor's orders. Kathleen Smith, the mother, told Deputy Lentz that her husband was hysterical and distraught; that in talking about their son he told her, "He's in the creek. I put him in the creek." Kathleen Smith and the parents of appellant told Deputy Sheriff Lentz that appellant's pants were wet, had sand and mud on them below the knees. The child was found drowned in a small, rather shallow creek a short distance from the family home. Appellant's belt was found on the bank of the creek adjacent to the place where the child was found. Deputy Sheriff Lentz observed that the brush and brambles were very thick along the small creek at the location where the child was found. He thought that the brush and brambles would have scratched and cut the child's legs *if he had gone through the brush by himself,* but the deputy saw no cuts or scratches on the little boy's legs. There were scratches on the boy's neck, recent bruises on the side of his head, and older bruises on his buttocks. Deputy Lentz concluded there had been foul play and that the boy had been carried through the brush and put in the creek by someone.

The circumstances were strongly incriminating and made the father of the victim a prime suspect. Armed with substantially all of the foregoing information constituting probable cause and a factually emergent and exigent situation, Deputy Sheriff Lentz reacted promptly, effectively, and reasonably as a well-trained police officer should. He went in hot pursuit of the appellant and the incriminating clothes. There was in fact probable cause at the time for Deputy Lentz to have arrested the appellant lawfully at the hospital—without a warrant. He did not do so but he

obtained the clothes from the hospital ward clerk whose function it was to look after the clothes of hospital patients. We think the wetness of the pants with sand and mud on them, ostensibly from the creek where the boy was drowned, presented Deputy Lentz with an emergent or exigent situation as to which he had to act promptly. Otherwise, the pants could have lost their significance as evidence by being washed, dried, and pressed in a very short time as a routine matter in the hospital laundry at the instance of the ward clerk or someone else. In any event, the pants would have dried out. Obtaining the pants promptly, observing their condition as to wetness, sand, and mud, ostensibly from the creek where the child was drowned, was good police work under these circumstances. Deputy Lentz was doing no more than preserving significant and incriminating evidence from possible loss. It seems to us beyond debate that the testimony of Deputy Lentz and the laboratory report from the Federal Bureau of Investigation regarding the sand and mud on the pants were significant evidence placing appellant in the same time frame at the scene of the crime in the small creek where his son was drowned. We think the totality of the circumstances constituted probable cause and the facts were sufficiently emergent or exigent to justify the warrantless seizure of appellant's pants by Deputy Lentz.

As mentioned above, we are convinced that the instant case is an appropriate one to apply the probable cause plus exigent circumstance formula mentioned *supra*. At the time when Deputy Sheriff Lentz seized the clothes, an arrest without a warrant—but based on probable cause—would have been a lawful one. We think this is a very significant factor in making the seizure of the clothes a reasonable rather than an unreasonable one. In this regard, in *State v. Brooks,* 57 Wn.2d 422, 357 P.2d 735 (1960), we held that a search and seizure was incidental to a lawful arrest and, therefore, a proper and constitutional one *although it occurred in point of time prior to the occurrence of the lawful arrest.* We question whether the actual formality or

technicality of an actual arrest prior to a search and seizure is requisite where a police officer had probable cause either to arrest the suspect or to seize evidence and, in addition, reasonably emergent or exigent circumstances existed as to the safety and security of the evidence.

The decision of the Court of Appeals and the judgment of the trial court should be affirmed. It is so ordered.

HUNTER, HAMILTON, BRACHTENBACH, and DOLLIVER, JJ., concur.

STAFFORD, C.J., concurs in the result.

HOROWITZ, J. (dissenting)—I would set aside the seizure of appellant's clothes as illegal in the absence of a valid search warrant.

The denial of defendant's motion to suppress evidence raises questions concerning the meaning and application of the Fourth Amendment,[3] the great importance of which is not confined to the proper disposition of the case at bench. Because I believe the rationale of the majority opinion used to dispose of the issues involved fails to give proper effect to the decisions of the Supreme Court of the United States, binding on us under the supremacy clause, I must respectfully dissent for the reasons next discussed.

The Supreme Court firmly adheres to the principle that all warrantless searches and seizures, subject only to a few well–delineated exceptions, are unreasonable and per se constitutionally offensive. *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 36 L. Ed. 2d 854, 93 S. Ct. 2041 (1973); *United States v. United States Dist. Court,* 407 U.S. 297, 314–18, 32 L. Ed. 2d 752, 92 S. Ct. 2125 (1972); *Coolidge v. New Hampshire,* 403 U.S. 443, 454–55, 29 L. Ed. 2d 564, 91 S. Ct. 2022 (1971); *Katz v. United States,* 389 U.S. 347,

---

[3] "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. 4.

357, 19 L. Ed. 2d 576, 88 S. Ct. 507 (1967); *Stoner v. California,* 376 U.S. 483, 486, 11 L. Ed. 2d 856, 84 S. Ct. 889 (1964). The rule is stated in *Cady v. Dombrowski,* 413 U.S. 433, 439, 37 L. Ed. 2d 706, 93 S. Ct. 2523 (1973), quoting *Camara v. Municipal Court,* 387 U.S. 523, 528–29, 18 L. Ed. 2d 930, 87 S. Ct. 1727 (1967).

The ultimate standard set forth in the Fourth Amendment is reasonableness. In construing this command, there has been general agreement that "except in certain carefully defined classes of cases, a search of private property without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant."

The rule, therefore, requires that "the police must, whenever practicable, obtain advance judicial approval of searches and seizures through the warrant procedure . . ." *Terry v. Ohio,* 392 U.S. 1, 20, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968). The court in *United States v. United States Dist. Court* at page 316, holds that the "very heart of the Fourth Amendment directive" is that "where practical, a governmental search and seizure should represent both the efforts of the officer to gather evidence of wrongful acts and the judgment of the magistrate that the collected evidence is sufficient to justify invasion of a citizen's private premises or conversation."

The exceptions to the warrant requirement are "jealously and carefully drawn". *Jones v. United States,* 357 U.S. 493, 499, 2 L. Ed. 2d 1514, 78 S. Ct. 1253 (1958). The established exceptions are not founded upon a "subjective view regarding the acceptability of certain sorts of police conduct" but only upon "considerations relevant to Fourth Amendment interests" and "established Fourth Amendment principles." *Chimel v. California,* 395 U.S. 752, 764–65, 23 L. Ed. 2d 685, 89 S. Ct. 2034 (1969). The burden of proof is upon the government to establish the reasonableness of a warrantless search, at least by a preponderance of the evidence. *United States v. Matlock,* 415 U.S. 164, 177–78 n.14, 39 L. Ed. 2d 242, 94 S. Ct. 988 (1974).

An interpretation of the Fourth Amendment which would deemphasize the warrant, by reading the two clauses of the amendment (the "unreasonable searches and seizures" clause and the warrant clause) independently, has been rejected by the court after its apparent adoption in *United States v. Rabinowitz,* 339 U.S. 56, 94 L. Ed. 653, 70 S. Ct. 430 (1950). In *Rabinowitz* the court stated at page 66:

The relevant test is not whether it is reasonable to procure a search warrant, but whether the search was reasonable. That criterion in turn depends upon the facts and circumstances—the total atmosphere of the case.

*Rabinowitz* was specifically overruled in *Chimel v. California, supra* at 768. In the course of its opinion, the court in *Chimel* pointed out the importance of the warrant requirement in the scheme of the Fourth Amendment.

Mr. Justice Frankfurter wisely pointed out in his *Rabinowitz* dissent that the Amendment's proscription of "unreasonable searches and seizures" must be read in light of "the history that gave rise to the words"—a history of "abuses so deeply felt by the Colonies as to be one of the potent causes of the Revolution. . . ." 339 U. S., at 69. The Amendment was in large part a reaction to the general warrants and warrantless searches that had so alienated the colonists and had helped speed the movement for independence. In the scheme of the Amendment, therefore, the requirement that "no Warrants shall issue, but upon probable cause," plays a crucial part. As the Court put it in *McDonald* v. *United States,* 335 U. S. 451:

"We are not dealing with formalities. The presence of a search warrant serves a high function. Absent some grave emergency, the Fourth Amendment has interposed a magistrate between the citizen and the police. This was done not to shield criminals nor to make the home a safe haven for illegal activities. It was done so that an objective mind might weigh the need to invade that privacy in order to enforce the law. The right of privacy was deemed too precious to entrust to the discretion of those whose job is the detection of crime and the arrest of criminals. . . . And so the Constitution requires a magistrate to pass on the

desires of the police before they violate the privacy of the home. We cannot be true to that constitutional requirement and excuse the absence of a search warrant without a showing by those who seek exemption from the constitutional mandate that the exigencies of the situation made that course imperative." *Id.*, at 455–456.

. . . Clearly, the general requirement that a search warrant be obtained is not lightly to be dispensed with, and "the burden is on those seeking [an] exemption [from the requirement] to show the need for it. . . ." *United States* v. *Jeffers*, 342 U. S. 48, 51.

(Footnote omitted.) *Chimel v. California, supra* at 760–62.

The reasoning of *Rabinowitz* was again rejected by the court in *United States v. United States Dist. Court, supra.* The court states at pages 315–16:

Though the Fourth Amendment speaks broadly of "unreasonable searches and seizures," the definition of "reasonableness" turns, at least in part, on the more specific commands of the warrant clause. Some have argued that "[t]he relevant test is not whether it is reasonable to procure a search warrant, but whether the search was reasonable," *United States* v. *Rabinowitz*, 339 U. S. 56, 66 (1950). This view, however, overlooks the second clause of the Amendment. The warrant clause of the Fourth Amendment is not dead language. Rather, it has been

"a valued part of our constitutional law for decades, and it has determined the result in scores and scores of cases in courts all over this country. It is not an inconvenience to be somehow 'weighed' against the claims of police efficiency. It is, or should be, an important working part of our machinery of government, operating as a matter of course to check the 'well–intentioned but mistakenly over–zealous executive officers' who are a part of any system of law enforcement." *Coolidge* v. *New Hampshire*, 403 U. S., at 481.

(Footnote omitted.)

Nevertheless, the majority's argument for finding the search and seizure in the instant case proper under the Fourth Amendment appears to be based in large part upon the discredited logic of *Rabinowitz*—that a warrantless

search and seizure which does not come within an established exception to the warrant requirement is nevertheless constitutional if it represents good, responsible, and "reasonable" police work. To justify this reasoning, the majority relies heavily upon *United States v. Watson,* 423 U.S. 411, 46 L. Ed. 2d 598, 96 S. Ct. 820 (1976).

*Watson* does not support the majority's reasoning. There the Supreme Court upheld a warrantless arrest of defendant by postal inspectors while he was in a restaurant for possession of stolen mail, on probable cause but without exigent circumstances. The court squarely rested its holding upon "the ancient common–law rule that a peace officer was permitted to arrest without a warrant for a misdemeanor or felony committed in his presence as well as for a felony not committed in his presence if there was reasonable ground for making the arrest." *United States v. Watson, supra* at 418. Justice Powell, in his concurring opinion, emphasizes that the rationale of the decision is the historical acceptance, both before and after adoption of the Fourth Amendment, of the warrantless arrest.

Logic . . . would seem to dictate that arrests be subject to the warrant requirement at least to the same extent as searches.

But logic sometimes must defer to history and experience. The Court's opinion emphasizes the historical sanction accorded warrantless felony arrests . . . There is no historical evidence that the Framers or proponents of the Fourth Amendment, outspokenly opposed to the infamous general warrants and writs of assistance, were at all concerned about warrantless arrests by local constables and other peace officers. . . . As the Court today notes, the Second Congress' passage of an Act authorizing such arrests so soon after the adoption of the Fourth Amendment itself underscores the probability that the constitutional provision was intended to restrict entirely different practices.

(Footnote omitted.) *United States v. Watson, supra* at 429–30. There is nothing in *Watson* even suggesting its holding in any way affects the law presently governing the seizure of evidence. *See also United States v. Watson,*

*supra* at 418 n.6, 425 (Powell, J., concurring), 832 (Stewart, J., concurring).

Thus, the rule as first stated above, that warrantless searches and seizures are unreasonable unless shown to be within one of the established exceptions, is still the Supreme Court's interpretation of the Fourth Amendment, and is binding upon this court by force of the supremacy clause. *Martin v. Hunter's Lessee,* 14 U.S. (1 Wheat.) 304, 340–41, 4 L. Ed. 97 (1816); *Cooper v. Aaron,* 358 U.S. 1, 17–19, 3 L. Ed. 2d 5, 78 S. Ct. 1401 (1958); *Scruggs v. Rhay,* 70 Wn.2d 755, 760, 425 P.2d 364 (1967).

Since Officer Lentz did not have a search warrant, therefore, the search and seizure was unreasonable and per se unconstitutional *unless* it came within the terms of an established exception to the warrant requirement. The majority appears to recognize this, and additionally seeks to uphold the warrantless search and seizure on the basis of one or all of three established exceptions. In the majority's order these are: (1) probable cause for the search and seizure plus exigent circumstances; (2) valid consent by the ward clerk to the search and seizure; and (3) incident to a lawful arrest.

It is clear, of course, that Officer Lentz did conduct a search and seizure within the meaning of the Fourth Amendment. This fact is assumed by both the majority and the Court of Appeals, both of which rely heavily upon exceptions to the warrant requirement to validate the actions of Officer Lentz. The Fourth Amendment's warrant requirement, and its exceptions, do not come into play unless it is first established that a search did in fact take place. In addition, it is clear a search and seizure did occur. The current test is stated in *People v. Whalen,* 390 Mich. 672, 677, 213 N.W.2d 116 (1973).

> From *Katz v. United States,* 389 US 347; 88 S Ct 507; 19 L Ed 2d 576 (1967) there has evolved a test, applied by the courts, to determine whether or not a search, by Fourth Amendment standards, has indeed taken place. Simply put, if an individual has a reasonable expectation

of privacy in the area searched, or the materials seized, a search has been conducted.

Appellant had a reasonable expectation of privacy in the "area searched" (the anteroom) and a reasonable expectation of privacy in "the materials seized" (his clothes). Thus, there was a search and seizure, for the police officer intruded upon the privacy on which appellant "justifiably relied." *Katz v. United States,* 389 U.S. 347, 353, 19 L. Ed. 2d 576, 88 S. Ct. 507 (1967). The anteroom was on the third floor of the hospital, and was the only link between appellant's room and the hallway. It was a private area in the hospital and not one open to public view, such as a waiting room. It contained the only closet for the storage of appellant's clothes.

The fact that appellant did not have exclusive use of the anteroom closet did not make his expectation of privacy any less reasonable. For example, in *Mancusi v. DeForte,* 392 U.S. 364, 20 L. Ed. 2d 1154, 88 S. Ct. 2120 (1968), state officials seized, without warrant, union records from an office shared by defendant and other union officials. Defendant made no claim the records were taken from a part of the office reserved for his exclusive use. The court found there was a search. The court first noted defendant was not required to show legal possession or ownership of the searched premises. The court then stated that had defendant occupied a private office in the union headquarters, he would clearly have had a reasonable expectation of privacy in the records seized. The fact he shared the office with the other officials did not fundamentally change the situation.

> DeForte still could reasonably have expected that only those persons and their personal or business guests would enter the office, and that records would not be touched except with their permission or that of union higher–ups.

*Mancusi v. DeForte, supra* at 369. Appellant's clothes may be equated with the union records in *Mancusi,* and the shared anteroom with the union office.

It is equally clear that the ward clerk was acting at the direction of Officer Lentz in taking the clothes, and not as a private individual acting on her own initiative. *Cf. Coolidge v. New Hampshire,* 403 U.S. 443, 486–90, 29 L. Ed. 2d 564, 91 S. Ct. 2022 (1971). Therefore, the actions of an intermediary in the taking of the clothes did not prevent this from being a governmental search and seizure. Officer Lentz went to the hospital solely for the purpose of retrieving appellant's clothes. He testified he went there "[t]o see if Mr. Smith's clothing—to see if the hospital had any of Mr. Smith's clothing." That morning, the ward clerk testified, she had "never personally talked to Mr. Smith," and that she had "nothing" to do with the room in which he was placed. Contrary to the statement made in the majority's opinion, she did not place Mr. Smith's clothes in the anteroom, she only retrieved them from there when requested by Officer Lentz. She stated on cross-examination:

> Q. But, prior to, well, say, prior to the arrival of Deputy Lentz, had you seen any activity in connection with the Smith room? A. I seen him brought in. Q. And? A. And our orderly and the nurse who was in charge of the room that day was working in there, but other than that I had nothing, connection with it.

When she was asked by Officer Lentz if the hospital had appellant's clothes, she told him "I would check." She went to the closet "which we hang the patient's clothes in and they were there."

Was the warrantless search and seizure in the hospital constitutional under the majority's first argument—the presence of both probable cause and "exigent" circumstances? Although not made clear in the opinion, the majority apparently finds probable cause in circumstances which pointed to appellant's guilt and which would have justified his arrest—that Officer Lentz was told by appellant's wife and parents that appellant's clothes were wet and muddy and that he had told his wife he had put his son in the creek. I would agree that this constituted probable cause either for his arrest or for issuance of a warrant

for a search of the hospital's anteroom and a seizure of the clothes. The "exigent" circumstances, however, are not established and were clearly not present. The "exigent" circumstances relied upon by the majority are the wet, sandy, and muddy condition of appellant's pants, which "could have lost their significance as evidence by being washed, cleaned, and dried in a very short time as a routine matter in the hospital laundry at the instance of the ward clerk or someone else."

A closer examination of the actual circumstances facing Officer Lentz at the time he arrived at the hospital, and the scope of the "exigent" circumstances exception, reveals the exception is clearly inapplicable. The original application of the "exigent" circumstances exception was in the warrantless search of a car on the highway, "where it is not practicable to secure a warrant because the vehicle can be quickly moved out of the. locality or jurisdiction in which the warrant must be sought." *Carroll v. United States,* 267 U.S. 132, 153, 69 L. Ed. 543, 45 S. Ct. 280, 39 A.L.R. 790 (1925); *see Coolidge v. New Hampshire, supra* at 458–64 (automobile exception inapplicable where defendant arrested in his house, and car seized was outside in his driveway). In later cases the court has suggested, without setting forth specific guidelines, that the threatened removal, destruction, or concealment of evidence or contraband, when accompanied by the existence of probable cause to believe such evidence is present at a particular place and is so threatened, may constitute exigent circumstances rendering permissible a warrantless search or seizure. "There are exceptional circumstances in which, on balancing the need for effective law enforcement against the right of privacy, it may be contended that a magistrate's warrant for search may be dispensed with. But this is not such a case. . . . No evidence or contraband was threatened with removal or destruction . . ." *Johnson v. United States,* 333 U.S. 10, 14–15, 92 L. Ed. 436, 68 S. Ct. 367 (1948); *see United States v. Jeffers,* 342 U.S. 48, 96 L. Ed. 59, 72 S. Ct. 93 (1951); *McDonald v. United States,* 335 U.S. 451, 455, 93

L. Ed. 153, 69 S. Ct. 191 (1948). One case which has articulated the guidelines courts have developed for determining the lawfulness of warrantless seizures of contraband under the "exigent" circumstances exception is *United States v. Rubin*, 474 F.2d 262 (3d Cir. 1973). The court states at page 268:

When Government agents, however, have probable cause to believe contraband is present and, in addition, based on the surrounding circumstances or the information at hand, they *reasonably* conclude that the evidence will be destroyed or removed before they can secure a search warrant, a warrantless search is justified.

(Italics mine.) Circumstances courts have found relevant to determine the existence of exigent circumstances are:

(1) [T]he degree of urgency involved and the amount of time necessary to obtain a warrant . . . (2) reasonable belief that the contraband is about to be removed . . . (3) the possibility of danger to police officers guarding the site of the contraband while a search warrant is sought . . . (4) information indicating the possessors of the contraband are aware that the police are on their trail . . . (5) the ready destructibility of the contraband and the knowledge "that efforts to dispose of narcotics and to escape are characteristic behavior of persons engaged in the narcotics traffic," United States v. Manning, 448 F.2d 992, 998–999 (2d Cir. 1971) . . .

*United States v. Rubin, supra* at 268–69.

Examination of the circumstances in the instant case shows clearly that not one of the five circumstances above was present at the time of the search of the anteroom and the seizure of appellant's clothes.

The first and second circumstances—the urgency involved, amount of time necessary to obtain a warrant, and reasonable . belief the evidence is about to be removed—are not present. The "urgency" hypothesized by the majority is that the clothes (the evidence) were "about to be removed" by washing. They "could have lost their significance as evidence by being washed, cleaned, and dried in a very short time as a routine matter in the hospital laundry at the instance of the ward clerk or someone

else." However, at the time Officer Lentz asked for the clothes, no circumstances existed to support any "reasonable belief" that the clothes were about to be washed by the hospital or taken home by appellant or any member of his family. None of the several hospital employees who testified at the trial mentioned anything suggesting the clothes might be washed that day or at any time in the future. Officer Lentz did not say he had such a "reasonable belief"—in fact, he did not ask the ward clerk or any other hospital employee with whom he spoke if such was the case. Nor was there any danger of appellant leaving his "security" room and secreting the clothes from the anteroom. As the majority opinion states: "As a very practical matter, it is highly unlikely that appellant under the circumstances would have had any access to his clothes." All Officer Lentz needed to do was to tell the ward nurse or her supervisor to be sure the clothes were not removed for washing until he returned with a warrant. Very simply, no facts were present in the instant case· from which the officer could reasonably have concluded there was an urgency due to imminent removal or washing of the clothes.

The Supreme Court cases dealing with "threatened destruction" of evidence as an exigent circumstance have required the government to show "the goods ultimately seized were . . . in the process of destruction." *Vale v. Louisiana,* 399 U.S. 30, 35, 26 L. Ed. 2d 409, 90 S. Ct. 1969 (1970). The court cited three cases to support this requirement. *Schmerber v. California,* 384 U.S. 757, 16 L. Ed. 2d 908, 86 S. Ct. 1826 (1966); *United States v. Jeffers, supra; McDonald v. United States, supra.* In *Schmerber,* the only nonvehicle case where the court has upheld the reasonableness of a warrantless search at least in part on the basis the evidence was in the process of destruction, the search was approved because the "delay necessary to obtain a warrant, under the circumstances [alcohol actually dissolving in the blood], threatened 'the destruction of evidence.'" *Schmerber v. United States, supra* at 770, citing *Preston v. United States,* 376 U.S. 364, 367, 11 L. Ed. 2d 777, 84 S.

Ct. 881 (1964). In *Jeffers* at page 52, the court refers to "imminent" destruction of evidence. In *McDonald v. United States, supra* at 455, the court mentions "property in the process of destruction."

Neither the State nor the majority opinion has shown the evidence (the clothes) in the instant case was "in the process of destruction" or in "imminent" danger of destruction. There is no more than a speculation, unsupported by a single fact, that the clothes might at some future time have been washed by the hospital or taken home by some unnamed person.

Nor is there any reason shown why Officer Lentz could not have obtained a warrant when the search and seizure occurred at approximately 10:30 a.m. on a Monday morning.[4] The burden was on the State to show an exceptional situation existed and it was impracticable to obtain a search warrant. *Vale v. Louisiana, supra* at 34–35.

The third factor—"the possibility of danger to police officers guarding the site of the contraband while a search warrant is sought"—is obviously not present. It is clear that Officer Lentz could easily have requested a supervisorial employee of the hospital to insure the clothes would not be removed for washing until he returned with a warrant.

The fourth and fifth factors—the possibilities that the possessor of the contraband is aware of police pursuit and might destroy the evidence—again are obviously not present in the instant case. As the majority pointed out, and as we have already noted, "[a]s a very practical matter, it is highly unlikely that appellant under the circumstances would have had any access to his clothes." In addition, there is no suggestion in the record that appellant was aware of the presence of Officer Lentz in the hospital. Appellant was taken to the hospital by his parents, and was admitted on the orders of a doctor in the hospital. He was

---

[4]CrR 2.3(c), which provides that a search warrant may be obtained based upon "an officer's sworn telephonic statement to the judge . . ." was not effective until July 1, 1973. The search and seizure in the instant case occurred in 1972.

taking a shower at the time Officer Lentz arrived at the hospital, and there is no suggestion he was ever aware of the officer's visit. There is no evidence Officer Lentz arrested appellant before or after the seizure, or even saw him thereafter.

What facts, then, are there in this record which can be held to rise to the dignity of a constitutional exigency? Can it fairly be said that there were here "exigent circumstances in which police action literally must be 'now or never' to preserve the evidence of the crime . . ."? *Roaden v. Kentucky,* 413 U.S. 496, 505, 37 L. Ed. 2d 757, 93 S. Ct. 2796 (1973). At most, what is shown is that it was more convenient for Officer Lentz to take the clothes immediately than to get a warrant and have the clothes watched until he returned.

The majority, in effect, next attempts to uphold the warrantless search and seizure under the "consent" exception. This is also the rationale relied on by the Court of Appeals, which reasoned that the anteroom where the clothes were kept was a common area over which the hospital, and presumably certain patients including appellant, had "at least joint control", so that the hospital could consent to the search and seizure. *State v. Smith,* 12 Wn. App. 720, 725, 531 P.2d 843 (1975). The majority agrees with this analysis, and even attempts to bolster it by arguing that in fact the hospital had "total" rather than just "joint" control over the anteroom and clothes because appellant had been placed in a hospital security room, and it was "highly unlikely" he would have had any access to the anteroom and his clothes at all.

Again, however, a careful examination of the cases dealing with this exception to the warrant requirement for consensual searches reveals clearly it is unavailable to validate the search and seizure by Officer Lentz. The problems with the majority's and the Court of Appeals' analysis are, first, assuming that it was in fact the "hospital" which consented to the search and seizure, when only a "ward clerk" acting on her own without management approval consented; and

second, ignoring the fact of appellant's presence in the immediate vicinity of the search—of which both the ward clerk and Officer Lentz were aware.

It is useful at this point to examine the rationale and scope of third–party consent to a search and seizure. Some courts, noting the general rule that exceptions to the warrant requirement are justified on the basis of necessity, *Johnson v. United States, supra* at 14–15, but finding no "necessity" to justify the third–party consent exception, have held it should therefore be narrowly construed.

> It is fundamental that the doctrine which recognizes the validity of a third party's consent to a search must be applied guardedly to prevent erosion of the protection of the Fourth Amendment, since it makes no requirement of the existence of probable cause for the search and does not constitute an exception based on necessity.

*United States ex rel. Cabey v. Mazurkiewicz,* 431 F.2d 839, 843 (3d Cir. 1970). Some courts have found the requisite "necessity" in the burden placed on the police if they were required to ascertain the ownership of any article or premises searched when the person giving consent to the search is apparently in control of the premises or article. The "necessity" disappears, however, when the police (as in the instant case) have ample notice that the rights of someone *other than the consenting party* might be involved. *United States v. Poole,* 307 F. Supp. 1185, 1190 (E.D. La. 1969).

In third–party consent cases, the relationship between the party consenting and the defendant falls into one of two categories. The first, and presumably the one the majority maintains existed in the instant case, is a "joint control" or "common authority" relationship—a relationship of co–ownership or copossession. Thus, if the defendant together with one or more persons uses the same premises or the same receptacle, such as a suitcase or duffel bag, the consent of one of these persons under certain circumstances may be sufficient to authorize a search of those premises or receptacle. The theory is that each of the parties to the relationship has an independent right to the use,

possession, or ownership of the whole, and, accordingly, each may give consent to its search. The defendant, who has not expressly given consent to the search and seizure, is deemed to have authorized (on an "assumption of risk" basis) the other parties to the relationship to consent for him. The defendant has, by virtue of sharing use or possession of a premise or receptacle, waived his constitutional right to be free from a warrantless police search of an area or receptacle in which he has a reasonable expectation of privacy.

The Supreme Court has recently delineated the rules governing third–party consent based on copossession or common use in *United States v. Matlock,* 415 U.S. 164, 94 S. Ct. 988, 39 L. Ed. 2d 242 (1974). There, the police received consent to search defendant's bedroom and closet from his paramour who jointly occupied, with defendant, the area searched. The court upheld the search and stated:

> [W]hen the prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that consent was given by the defendant, but may show that permission to search was obtained from a third party who possessed *common authority over or other sufficient relationship to the premises or effect sought to be inspected.*

(Italics mine.) *United States v. Matlock, supra* at 171. Justice White clarified what the court meant by "common authority" in a footnote to the above–quoted sentence.

> Common authority is, of course, not to be implied from the mere property interest a third party has in the property. The authority which justifies the third–party consent does not rest upon the law of property . . . but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co–inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

Under the copossession or common authority rationale of *Matlock,* a nonmanagement, nonsupervisorial employee

cannot validly consent to the police search of the premises of his employer. Such an employee does not have "mutual use" with his employer of the employer's premises, nor "joint access or control [of the premises] for most purposes." It is not "reasonable to recognize" that such an employee can authorize the search "in his own right" and that the employer has "assumed the risk" of such a search. An employee not in charge of the employer's premises has only limited authority over the premises, and not the "common authority" required by *Matlock*.

> [O]ne with a right to enter for a limited purpose—such as a maid, janitor, repairman or the like—does not possess the equal right to use or occupancy required for consent to a search.

*People v. Taylor,* 31 Ill. App. 3d 576, 579, 333 N.E.2d 41 (1975). For example, in *People v. Litwin,* 44 App. Div. 2d 492, 355 N.Y.S.2d 646 (1974), consent to search of an apartment was given the police by defendant's baby-sitter. The court held, noting *Matlock:*

> There is nothing in the record to indicate that the Troopers had any basis to rely on permission of the baby-sitter . . . to the search. . . . To hold that the entry was lawful under the circumstances here presented would reduce the Fourth Amendment to a nullity and leave homes secure only in the unfettered discretion of a baby-sitter.

*People v. Litwin, supra* at 494–95.

The ward clerk testified as to her duties, and they are quite limited.

> Q. Now, then, you mentioned being at the Station on the third floor, what would be your duties there on the third floor? A. Ward clerk duties are to help the head nurse and we admit all new patients onto the floor and I record all the doctor's orders onto the cardex so the R.N.'s have access to them without going through the charts. . . . Q. Are you in charge of the floor? A. No, Diane Richards was head nurse at that time.

She also testified that when clothes are taken from the hospital by the patient's family or sent to the cleaners, "it

is my duty to see they are checked off so no clothing is lost."

It is clear that neither her employer (the hospital) nor the appellant "have assumed the risk" that the ward clerk might permit the anteroom to be searched. Appellant's expectation that someone with no more authority than the ward clerk will not consent to a police search of the only storage area for his clothes and to a police seizure of his clothes is certainly reasonable, and he cannot be said to have assumed this risk.

Nor could the ward clerk authorize the search of her employer's premises on the basis of actual or implied authority from her employer or appellant. There is nothing in the record suggesting the presence of actual authority. In addition, the law of bailments suggests she had no actual authority. Since a bailee who delivers the bailed goods to an authorized person (such as a police officer without a valid warrant) is liable for a conversion of the goods or in damages for breach of contract (R. Brown, *The Law of Personal Property* 282 (3d Ed. 1975)), it is unlikely the hospital would have expressly authorized a ward clerk to redeliver patient's clothes to anyone except the patient or his family. In addition, the ward clerk had no implied authority. Only employees left in charge of their employer's premises have been found to have the requisite implied authority.

> Generally, the courts have been of the view that the average employee, such as a clerk, janitor, driver, or other person temporarily in charge, may not give consent.

LeFave, *Search and Seizure: "The Course of True Law . . . Has Not . . . Run Smooth"*, 1966 U. Ill. L.F. 255, 320. In *People v. Weaver*, 241 Mich. 616, 620–21, 217 N.W. 797 (1928), the court stated:

> If the constitutional rights of the citizen may be waived by any Tom, Dick, or Harry, whom he employs and temporarily puts in charge of his property, they hang by a very slender thread indeed.

In *Hays v. State*, 38 Okla. Crim. 331, 261 P. 232 (1927), a clerk left temporarily in charge of his employer's grocery

gave the police authority to search the premises. The court found the consent invalid, and held:

> "In this instance we think the clerk could act for the owner in his absence, and bind him as to such matters and things as would usually arise in, and be a part of, the duties of the employment.
> "
> . . .
> "The search of the premises for stolen goods is an unusual procedure, and not such as would be expected to arise in the course of the business of keeping a grocery store, and, in the absence of proof that the owner of the store had duly authorized his clerk to waive his privilege of immunity against an unreasonable and unlawful search of his said store, the presumption of such authority to waive the privilege would not arise merely from the fact of such employment.

*Hays v. State, supra* at 335. *Accord, United States v. Ruffner,* 51 F.2d 579, 579–80 (D. Md. 1931); *State v. Cundy,* 86 S.D. 766, 201 N.W.2d 236 (1972); *Finn's Liquor Shop, Inc. v. State Liquor Authority,* 31 App. Div. 2d 15, 294 N.Y.S.2d 592 (1968); *United States v. Block,* 202 F. Supp. 705, 707 (S.D.N.Y. 1962) (age, experience, responsibilities, and activities of employee must be taken into consideration when employer absent).

Courts have also been reluctant to hold that an employee had authority to consent to a police search when the employer was elsewhere on the premises at the time. In the instant case, there is no showing why Officer Lentz could not have requested permission from someone in authority, such as the hospital's administrator, to search for the clothes. Officer Lentz testified he "went to the information desk" in the hospital to learn the whereabouts of appellant, but never asked who had authority to consent to a police search. In *United States v. Ruffner, supra* at 580, the court stated:

> The agents apparently knew that Ruffner was the owner and Switzer [who gave permission to search] only an employee; and they also knew or could readily have learned, that the owner was near by. There was no such

required haste in making the search as to preclude consulting the owner in person for permission. The government did not undertake to prove that Switzer had in fact authority from Ruffner to permit the search. And, in the absence of such proof, the circumstances did not justify the application of the doctrine of apparent authority seemingly relied upon by the government.

*Accord, United States v. Maryland Baking Co.,* 81 F. Supp. 560, 562 (N.D. Ga. 1948). The above cases are consistent with the refusal of the Supreme Court to premise third–party consent to search upon "strained applications of the law of agency or unrealistic doctrines of 'apparent authority.'" *Stoner v. California,* 376 U.S. 483, 488, 11 L. Ed. 2d 856, 84 S. Ct. 889 (1964).

In any case, even a specific authorization from the hospital to the ward clerk would not have validated the search and seizure under the "common authority" test of *Matlock.* This is not a case where two persons have equal rights in property or are co–users of certain property. Rather, this is a case where the hospital was bailee of the clothes for defendant in a bailment for mutual benefit, which arises when "the bailment is an incident of the business in which the bailee makes a profit . . ." *Global Tank Trailer Sales v. Textilana–Nease, Inc.,* 209 Kans. 314, 316, 496 P.2d 1292 (1972). The hospital's duty was to exercise ordinary prudence under the circumstances in protecting the clothes.

> Where the bailment transaction is mutually beneficial to both parties, it is well settled that the bailee is required to use ordinary diligence in protecting the subject matter of the bailment from damage or loss. Ordinary diligence in this type of bailment has been defined as that care which men of ordinary prudence customarily take of their own goods of a similar kind and under similar circumstances.

(Footnote omitted.) R. Brown, *The Law of Personal Property* §11.2, at 258 (3d ed. 1975); *accord, Goodwin v. Georgian Hotel Co.,* 197 Wash. 173, 181, 84 P.2d 681, 119

A.L.R. 788 (1938)(bailee must show loss not due to his negligence). When a hopital enters a bailment for the safekeeping of a patient's possessions, "[a]s bailee, the hospital agrees to exercise due care in keeping the property and to deliver it, upon reasonable notice, to the patient or on his order, and to no one else." E. Hayt, L. Hayt, & A. Groeschel, *Law of Hospital, Physician and Patient* 448 (3d ed. 1972).

Thus, in a bailment for mutual benefit, the bailee has no authority to allow the bailor's property to be taken by the police without warrant, for a man of "ordinary prudence" would not allow his own property (especially if incriminating) to be taken from him under these circumstances.

> When property in the custody of a bailee for hire is demanded by third persons, under color of process, it becomes his duty to ascertain whether the process is such as requires him to surrender the property, and if it is not, then it is his right and duty to refuse and to offer such resistance to the taking, and adopt such measures for reclaiming it, if taken, as a prudent and intelligent man would, if it had been demanded and taken under a claim of right to the property by another without legal process.

*Roberts v. Stuyvesant Safe–Deposit Co.*, 123 N.Y. 57, 65–66, 25 N.E. 294 (1890), cited with approval in *National Safe Deposit Co. v. Stead*, 232 U.S. 58, 69, 58 L. Ed. 504, 34 S. Ct. 209 (1914); *see Morris v. Commonwealth*, 208 Va. 331, 334, 157 S.E.2d 191 (1967) (nurse did not have the right to consent to police seizure of patient's clothes).

The other error in the majority's consent analysis is the assumption that a third party's consent can bind a defendant when he is present on the premises at the time of the search and the police are aware of this fact. In the instant case, Officer Lentz knew appellant was present on the third floor of the hospital, where the search was made, but made no effort to get his consent. As he testified at trial, after reaching the third floor nursing station he "asked if Mr. Smith was in. They said, 'Yes', they gave me a room number and it was just south of the nursing station, and I asked if I could pick up Mr. Smith's clothing." Nevertheless, he

made no effort to seek appellant's consent, even though appellant was present in his room "just south of the nursing station" on the same floor.

Even in *Matlock,* the Supreme Court did not purport to hold that "common authority" or "joint control" of the premises permitted a third person to consent to a search in the presence of the defendant. The court states the third–party consent will be "valid as against the absent, nonconsenting person . . ." *United States v. Matlock,* 415 U.S. 164, 170, 94 S. Ct. 988, 39 L. Ed. 2d 242 (1974). In *Lawton v. State,* 320 So. 2d 463, 465 (Fla. App. 1975), the court noted:

> With the exception of *Vandenberg v. Superior Court,* 1970, 8 Cal.App.3d 1048, 87 Cal.Rptr. 876, no case has come to our attention in which a search predicated upon the consent of a joint occupant has been sustained when the defendant was physically present and affirmatively objecting to the search. *Vandenberg* upheld the search of a minor's room over his objection based upon consent given by his father. However, the court specifically grounded its holding upon the right of a father to exercise his parental authority over his son's behavior.

Language in *United States v. Ruffner, supra* at 580, is particularly appropriate to the instant case, where the police officer knew the clothes belonged to appellant and knew appellant was nearby, but made no effort to ask his consent.

> The agents apparently knew that Ruffner was the owner and Switzer only an employee; and they also knew or could readily have learned, that the owner was near by. There was no such required haste in making the search as to preclude consulting the owner in person for permission.

The reason the "common authority" rule is inapplicable in the presence of the defendant is stated in *People v. Mortimer,* 46 App. Div. 2d 275, 277, 361 N.Y.S.2d 955 (1974): "Constitutional rights may not be defeated by the expedient of soliciting several persons successively until the sought–after consent is obtained."

Nor can the warrantless search and seizure be justified under the majority's third exception—incident to arrest. Officer Lentz, while at the hospital, did not arrest appellant. After seizing the clothes, he returned to the sheriff's office. On cross–examination, he testified that he did not at any time place the appellant under arrest. When appellant was in fact arrested on the charge of murder is nowhere revealed in the record.

The seizure, therefore, was not incident to a lawful arrest. This exception to the warrant requirement applies only when the search "is substantially contemporaneous with the arrest and is confined to the immediate vicinity of the arrest." *Stoner v. California,* 376 U.S. 483, 486, 84 S. Ct. 889, 891, 11 L. Ed. 2d 856 (1964). In *Chimel v. California,* 395 U.S. 752, 763, 23 L. Ed. 2d 685, 89 S. Ct. 2034 (1969), the scope of the search incident to arrest was limited to the arrestee's person and the area immediately accessible to him from which he might obtain a weapon or seize destructible, incriminating evidence. Clearly, neither the spatial nor temporal requirements of a search incident to arrest were met in the instant case.

The majority, nevertheless, seeks to bring the seizure of appellant's clothes within this exception, apparently arguing that "the actual formality or technicality of an actual arrest" was not necessary in this case prior to the seizure where there was probable cause to arrest the defendant and the evidence was in danger.

This reasoning, however, completely ignores the clear rules set out by the Supreme Court in *Stoner* and *Chimel.* First, the anteroom was not within the "grab area" of appellant, and would have been outside the scope of a valid search incident to arrest. Second, although it is true that in certain circumstances a search may be "incident to arrest" although it preceded the arrest, this is only if the requirement of substantial contemporaneity of the seizure and arrest is met. A similar contention was made and rejected in *Layland v. State,* 535 P.2d 1043 (Alas. 1975). In *Layland,* a blood sample was taken from the defendant

without his consent and without a warrant. Although there existed probable cause to arrest him for negligent homicide at the time, he was not arrested until 3 months later. The state sought to validate the seizure under the search incident to arrest exception. The state argued "'the formal recitation of "you are under arrest" is practically meaningless, and should be excused'" where there was probable cause to arrest, but no arrest was made because defendant was in need of medical assistance. The court stated:

> We reject the state's contention for the following reasons. In *Cipres v. United States,* 343 F.2d 95 (9th Cir. 1965), the Ninth Circuit stated the prevailing rule as follows:
>
> > [A] prior search may be valid as incident to a substantially contemporaneous arrest without a warrant if the arresting officers had probable cause for the arrest at the time of the search, and the circumstances suggested that immediate search was necessary to preserve material subject to seizure.
> >
> > . . .
>
> It is our belief that the rule as . . . and enunciated in *Cipres* comports with constitutional standards, under the Fourth Amendment to the United States Constitution . . . only if the requirement of substantial contemporaneity of search and arrest is strictly construed. A contrary holding would essentially validate "exploratory searches" by police and emasculate the search warrant requirement. For the reason for permitting a "search incident to arrest" to precede the arrest is that
>
> > [w]hen probable cause for an arrest exists independently of what the search produces, the fact that the search precedes the formal arrest is immaterial when the search and arrest are nearly simultaneous and constitute for all practical purposes but one transaction. To hold differently would be to allow a technical formality of time to control when there has been no real interference with the substantive rights of a defendant.

(Footnotes omitted.) *Layland v. State, supra* at 1048–49, quoting *Holt v. Simpson,* 340 F.2d 853, 856 (7th Cir. 1965). *State v. Brooks,* 57 Wn.2d 422, 357 P.2d 735 (1960), cited by the majority does not announce a rule contrary to

*Stoner, Chimel,* or *Layland.* In *Brooks,* the search in question was conducted immediately prior to the arrest of the defendant.

It must be kept in mind that the decision of this court will affect not only the Fourth Amendment rights of the defendant, but those of every citizen of this state. The right of privacy protected by the Fourth Amendment is one of the outstanding features of American society, and the courts have the duty to insure against its dilution. As the court stated in *District of Columbia v. Little,* 178 F.2d 13, 16–17 (D.C. Cir. 1949):

> Democratic government has distinguishing features. One of them is freedom of speech for the individual; another is freedom of religion. Another is the right of privacy of a home from intrusion by government officials. These characteristics are not mere hallmarks. They are the beams and pillars about which the structure was built and upon which it depends. If private homes are opened to the intrusion of government enforcement officials, at the wish of those officials, without the intervening mind and hand of a magistrate, one prop of the structure of our system is gone . . . another form of government will have been substituted.
>
> . . .
> . . . The Fourth Amendment did not confer a right upon the people. It was a precautionary statement of a lack of federal governmental power, coupled with a rigidly restricted permission to invade the existing right. The right guaranteed was a right already belonging to the people. The reason for the search warrant clause was that public interest required that personal privacy be invadable for the detection of crime, and the Amendment provided the sole and only permissible process by which the right of privacy could be invaded. To view the Amendment as a limitation upon an otherwise unlimited right of search is to invert completely the true posture of rights and the limitations thereon.

The Supreme Court stated in *Boyd v. United States,* 116 U.S. 616, 635, 29 L. Ed. 746, 6 S. Ct. 524 (1886):

> [C]onstitutional provisions for the security of person and property should be liberally construed. A close and literal

construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon.

Since the search and seizure were without valid warrant, and do not come within a recognized exception, the motion to suppress should have been granted. *Mapp v. Ohio*, 367 U.S. 643, 6 L. Ed. 2d 1081, 81 S. Ct. 1684, 84 A.L.R.2d 933 (1961); *Weeks v. United States*, 232 U.S. 383, 58 L. Ed. 652, 34 S. Ct. 341 (1914).

The judgment should be reversed and a new trial granted.

ROSELLINI and UTTER, JJ., concur with HOROWITZ, J.