**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Johnnie HOLLAND, Defendant-Appellant.**

**No. 74–1655.**

United States Court of Appeals, Sixth Circuit.

Argued and Submitted Oct. 16, 1974.

Decided Feb. 18, 1975.

Certiorari Denied June 2, 1975.

See 95 S.Ct. 2401.

Robert J. Dugan, Mohney, Goodrich & Titta, Grand Rapids, Mich. (Court-appointed—CJA), for defendant-appellant.

Frank Spies, U. S. Atty., Robert C. Greene, Asst. U. S. Atty., Grand Rapids, Mich., for plaintiff-appellee.

Before EDWARDS and McCREE, Circuit Judges, and McALLISTER, Senior Circuit Judge.

EDWARDS, Circuit Judge.

This case involves the entry by police into an American home against the wishes of the occupant and without a judicially issued search warrant. The reason given for the entry is the claim of "hot pursuit" of an armed bank robber.

The prosecution insists that circumstances of this case come within the "hot pursuit" exception in Warden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967). The defendant contends that the pursuit was not that warm and that the intervention of a neutral magistrate's judgment was essential to lawful entry of the home concerned. Although the record involved here does not involve a police chase with eyeball contact, we believe the detailed facts known to the police and the time sequences concerned warrant our affirmance of the judgment of conviction of the United States District Court for the Western District of Michigan.

There is no doubt about appellant Holland's guilt. The jury had before it eyewitness identification of Holland as the armed man who robbed the First Federal Savings and Loan at Niles, Michigan, at approximately 4 o'clock in the afternoon of January 28, 1974. In addition, however, the jury heard testimony concerning Holland's confession after *Miranda* warnings, saw the revolver which the police had seized and which was introduced as an exhibit, and likewise heard testimony concerning the money which had been taken from the bank, most of which was recovered from the house under a search warrant issued after Holland and an associate had been arrested and the gun had been found. Since some of the facts detailed in the sentence immediately preceding were admitted because of the District Judge's denial of a motion to suppress evidence made before trial started, if the search was in violation of the Constitution, disposition of this case of necessity would require vacation of judgment and new trial under circumstances where much of the evidence of guilt would be inadmissible. The United States Supreme Court has, however, on many occasions upheld the right of American citizens to be free from arbitrary police intrusions into the sanctity of their homes, even if it might mean that a guilty person might go free. *See* Vale v. Louisiana, 399 U.S. 30, 34, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970); Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); Jones v. United States, 357 U.S. 493, 498, 78 S.Ct. 1253, 2 L.Ed.2d 1514 (1958); McDonald v. United States, 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153 (1948). *See also* Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). This court has followed these decisions faithfully. United States v. Griffin, 502 F.2d 959 (6th Cir. 1974); United States v. Stoner, 487 F.2d 651 (6th Cir. 1973); United States v. Nelson, 459 F.2d 884 (6th Cir. 1972).

Our affirmance of this conviction is predicated upon what we deem to be prompt, effective, and constitutionally permissible police work by a number of police officers in a small Western Michigan city numbering 17,000 persons. The critical observations and deductions, however, were supplied by one man. On that day Frank Bickel proved to be the small-town detective who could.

The robbery occurred at 3:55 p. m. when a young black male, subsequently described as 6 ft., 2–4 inches tall, clean shaven, with a short Afro haircut, and wearing a ¾ length tan coat appeared at the bank, drew a gun, and demanded and received money from one of the tellers. In the course of packing the money into a bag he was carrying, he removed a bag of Fritos which he had been eating and left it on the counter. The police received the alarm at 4:08 p. m. and arrived at the bank shortly thereafter.

Plainclothes detective Bickel arrived at the bank between 4:10 and 4:20, received a description of the bandit from the first officers to arrive, and proceeded to circle the area alone in his car. We deem his testimony at the suppression hearing as to the trail he picked up and his following of it to be critical to this case:

Q What did you observe, if anything?

A I found tracks leading from the direction of the bank, approximately a block away from the bank, leading in a southern direction from the bank, going from the bank.

Q Now when you say you saw tracks, were these tracks in the snow or in the dirt, or what?

A Well, there was snow.

Q Tracks in the snow?

A Yes.

* * * * * *

Q Was there anything significant about the tracks?

A Well, the only thing was they were pretty decent size strides. Somebody was running was what it was.

Q How can you tell that all the tracks you were looking at were made by the same foot or feet?

A Well, it had a rare, kind of a rare heel on it. Most heels either go straight up and down or slant a little toward the front. This heel cut back in. It had a pretty sharp cut back.

Q Why did you think that was significant?

A Well, it was a different type of heel to me.

* * * * * *

Q Was there a lot of snow on the ground or was it just a light covering of snow?

A There was approximately two inches, two, two and a half inches.

Q Two and a half inches of covering?

A Yes, I would say two and a half to three.

* * * * * *

Q Well, where exactly did you see the footprints, on the sidewalk or on the street or on a lawn?

A Well, it was right along the edge of the roadway is where it was.

Q On the edge of the roadway?

A And then it cut across the lawn, across the—

Q Okay. Were you by yourself when you were trailing these footprints?

A No, Sergeant Toner was—or, Captain Toner was there.

* * * * * *

Q Okay. Where did you and Captain Toner trail the footprints to, where did they lead?

A They led up to a house at 1644 Maple Street, which is two blocks away from the bank.

Bickel's testimony as to his observations at 1644 Maple Street continued:

Q When you say that the footprints led you to 1644 Maple, you mean you trailed them right up to the front door?

A No, they went to—

Q Where did they lead to?

A There had been a car sitting there because it was more or less melting that day, and you could see the snow where it melted and ran off of the car, you know, how you park a car. And it appeared they got into the car there, into a car.

Q It appeared that somebody got into a car there?

A That same track that went across the lawn, yes.

THE COURT: You say it appeared to lead to the car?

A Yes, it led to the car, right.

Q Were there other footprints in the snow in that neighborhood?

A. Yes. They were—I would say on the other side of the car, I would say on the right side of the car there probably was, leading in and out of the house, you know, people—

Bickel identified his time of arrival at the Maple Street residence as approximately 4:20 p. m. and went on to describe a conversation with a woman (later identified as Eva Kirtdoll) who came out of the house to inquire about what was going on:

Q What did you tell her?

A I told her we had some trouble down at the bank, down at the corner at the bank. And evidently she knew what I meant. She didn't say no more. I asked her if a car had just left there, and she said yes, there had been a car that just pulled out, it was

her son, and he had picked up his children.

Q Okay. And that is all she told you?

A. Yes.

Q And then did you do anything further at that residence?

A No. We left.

Q You left the residence?

A Yes.

Q And where did you go after that?

A We went to Ferry Street. I am not sure of the address.

Q Would it have been 844 Ferry— 814, excuse me?

A 814, yes.

Q Why did you go there?

A We went there because that is where she said her son had lived. A Billy Kirtdoll, I guess it was.

At the Kirtdoll house conversation with Billy Kirtdoll (as shown below) triggered Bickel's recollection of an earlier observation which he had made but had not then related to the bank alarm:

Q Did you question Billy Kirtdoll?

A As I walked up, they asked him where he had been, I believe, and where he had just come from.

Q And what did he say?

A His reply was that he had just come from his mother's house on Maple Street with his children, I believe he said.

Q Did he say anything else?

A And I asked him who was the other fellow that he had—because—I have got to back up, because earlier I saw this car. I didn't know who it was at the time I was going to the bank. I saw a car, a green car with two colored subjects in it.

Q One of them being Billy?

A I would not say.

Q You didn't know who the people in the car were?

A No.

Q But did you ask Billy if he had been with someone else when he drove from his mother's house to his house?

A When Toner and Winquist asked him this, his answer was that he picked up his children at his mother's house, and he let it drop at that.

Q And then you asked him if he had been with somebody else, or did you ask him that?

A I said, "Who was that other fellow you had with you?"

Q And what did he say?

A He said, "That was you that saw me at 16th and Oak, wasn't it?" I said, "Yes."

Q What else did he say, if anything?

A He then said he had—I am not sure what relation it is—Henry Gross with him.

Q He said that was a relation of his?

A Some relation, yes, and I don't remember what it was.

Bickel also testified that he knew Henry Gross and knew that Gross had a prison record. The examination continued as follows:

Q Okay. Now, after Billy Kirtdoll told you that Henry Gross had been in his car, what did you do at that point?

A We went to Henry Gross's house.

Q Okay. And did you know where Henry Gross lived?

A Yes, I did.

Q Having known him for eight years?

A Yes.

Q And if I could back track a minute, did Billy Kirtdoll tell you why he had been with Henry Gross or how Henry Gross happened to be in Billy Kirtdoll's car?

A No. He just said he picked him up at his mother's house and took him home on 5th Street.

Q And Billy Kirtdoll did not mention anyone else besides Henry Gross?

A No.

Q Did you go to Henry Gross's house again with Captain Winquist and—

A Yes.

Q Was it Captain Toner?

A Captain Toner, yes.

Q Was there anyone else with you?

A There was other officers around, but we were the main ones that was at the door.

Bickel estimated that they arrived at Gross' home at 1016 North Fifth Street about 20 to 30 minutes after he had left the bank, and that, by the time of their arrival there were eight police officers in total on the scene. Under Captain Winquist's orders the officers surrounded the house. Bickel went to the front door and asked a girl who came to the door and identified herself as Henry's sister, if Henry Gross was there and received a denial. Bickel's testimony continued:

Q Did you tell her why you were there?

A And then Winquist walked up. Like I say, he was there at that time, and started to—he told her, I believe, that there was—you will have to ask him—a bank robbery had taken place and we had reason to believe that he was there, because he had been dropped off. Now that is where he took over and he started in talking.

THE COURT: Winquist started in talking?

THE WITNESS: Yes.

Q And did Winquist ask to come in the house?

A Yes.

Q What did Henry's sister say?

A She still refused to let us in, because she said she didn't think that we should come in the house. She didn't want us in the house.

Q Did she deny that Henry was there?

A Yes, she said that he was not there.

Bickel testified that they were able to see several children playing in the living-room with a TV set going, and the examination continued:

Q Then Henry's sister said, no, Henry wasn't there, and, no, you couldn't come in; what happened after that?

A I heard something, a noise that appeared to be something falling down, like wood or something.

Q Where did you hear this noise?

A It appeared to be coming from the upstairs of that house.

Q Did you know that Henry's house—well, excuse me. Did you know that Henry lived in that house with his sisters and nephews and nieces, mother?

A I knew him to have lived there. I think he had been away from there, though. I am not sure. I thought he was away to prison.

Q You knew the house had several inhabitants, is that correct?

A Yes.

THE COURT: Had several what?

MR. DUGAN: Inhabitants. In other words, members of the family.

Q It was a large family?

A Yes, I believe it is.

Q And you heard a noise on the second floor?

A Yes, right.

Q Like wood dropping?

A It sounded like that, yes.

Q What did you think the significance of that was?

A Well, at the time that I heard it, I thought that somebody had tripped over something. This is what it sounded like.

Q What did you do then after hearing noise upstairs?

A By this time, as I say, I was just listening at that point, and Winquist was talking. He said, "Well, we are going to have to come in and search for Henry," is what he told this sister, I believe it is.

Q And what was her response?

A She said—well, I don't know what she said. I can't say what she said. I don't remember.

Q Okay. And what did you do, go in?

A We went in and searched, yes.

Several officers entered the house. Bickel and Captain Toner went upstairs where they found Henry Gross sitting on a couch and they arrested and handcuffed him.

Subsequent to the arrest, Bickel testified to observing two pairs of "wet shoes," one of them having the heels which "I had described earlier stuck out in my mind." He also testified that Henry Gross put on the other pair. Bickel testified that they then observed an attic door which was closed on the outside by bent nails which had been turned over, that he "bent them open" and opening the attic door found a man, who ultimately proved to be appellant Holland, lying on the attic floor. Holland likewise was arrested and searched. One of the officers found bullets on his person and the gun was found where he had been lying.

Bickel was present when Captain Winquist advised both Gross and Holland of their *Miranda* rights subsequent to which they were taken to the station. There Captain Toner and Bickel talked to Holland. "I read him the *Miranda* warning card again at the station in the I.D. room. And at that point he said that he had robbed the bank and he had the money stashed in a church, I believe."

Under cross-examination Bickel agreed that these events had occurred without a warrant for arrest or a warrant for search.

There was other testimony at the suppression hearing, confirming Bickel's deduction that the bank bandit had entered Billy Kirtdoll's car. Captain Paul Winquist, who at the time was acting Chief of the Niles Police Department, also testified concerning the employment of a police dog and his policeman handler in tracing the bank robber. He testified that at his orders the handler and the dog came to the bank, that the Fritos bag left by the bank robber was used to give the dog the scent, that the dog followed the scent across the floor of the bank, out the door, over to 17th Street, and along 17th Street to the driveway at 1644 Maple, arriving only shortly after Bickel. Captain Winquist testified concerning the dog's actions at the driveway: "He came up to the driveway and would kind of circle around there like he lost the scent, you know, it stopped there."

Captain Winquist also testified that after the arrest of Henry Gross and appellant Holland, he went to the Prosecuting Attorney's office and sought a warrant for the search of the Gross home to seek to locate the proceeds of the bank robbery and that such a search did result in recovery of those proceeds.

Still another police officer named Phillips testified that he had been present at the arrest of appellant Holland and standing beside Holland had shown his flashlight into the attic where Holland had been lying and had seen a gun described as a shiny, snub-nosed .38 in plain view. He seized this gun and it was subsequently introduced into evidence.

On these facts the District Judge who heard the motion to suppress evidence denied it, relying upon Warden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967), and saying as follows concerning appellant's charge that the search was in violation of the Fourth Amendment:

The Hayden case is authority for the proposition that it was not. Certainly there was no break in the chain of immediate pursuit of a serious crime, armed robbery of a bank, and the sequence of events, the totality of the circumstances furnished the kind of exigent circumstances, and this is—I catalogue this case as an exigent circumstance, hot pursuit case. And the combination of the exigent circumstances, the intelligence acquired, and

the ad hoc decision of the officers under the circumstances, combined to bring it within the Warden v. Hayden decision.

While this case is not without difficulty in constitutional terms, we believe that the District Judge properly denied the motion to suppress under the authority of Warden v. Hayden, *supra.* We recognize that the time interval between the armed robbery and police arrival at the house where Gross and Holland were arrested was probably somewhat greater than the time interval involved in the *Hayden* case. But the fact that there were three houses involved in this chain of circumstances and, hence, a somewhat longer pursuit, neither breaks the chain nor alters the concept of hot pursuit. The fact that the trail of running footsteps, followed by Detective Bickel, led to and ended at a driveway from which a car had recently departed, and that the scent followed by the police dog ended at the same place gave these officers ample reason to believe that the bandit had entered a car there. That car being identified to them by Eva Kirtdoll as one driven by her son, they proceeded immediately to where he and it were found, and there became aware from Detective Bickel's prior observation (confirmed by Kirtdoll) that another man had been in the Kirtdoll car with Billy shortly after the bank robbery. On being told that that man was Henry Gross, the officers doubtless decided to proceed to his home with the purpose of arresting him.

This decision leads to appellant's principal attack upon the hot pursuit theory. It is illustrated by the cross-examination of Bickel which follows:

Q At the time you got to the top of the stairs and arrested and frisked Henry Gross—excuse me for being repetitive, but at that time was he an under six-foot male with a long afro who had a mustache?

A Yes. Yes, I would say.

In the quiet atmosphere of a judicial chamber, it is easy to decide that there were discrepancies between the description of the bandit which the police had been furnished and the person of Henry Gross whom they then intended to arrest. He was, however, young, black and thin, and had been wearing a ¾ length coat, all of which characteristics corresponded with the description conveyed by hearsay to Detective Bickel. He was not, however, as tall or as clean shaven as the description indicated and he had a longer Afro than was described. The coat he had been wearing was brown rather than tan. And, in fact, the description given the police proved to fit Holland better than it did Gross. But as Detective Bickel testified (and we take judicial notice of the same fact) physical descriptions of perpetrators of violent crimes often prove to be somewhat inaccurate.

Even if we were convinced (as obviously we are not) that Bickel should have realized that the discrepancies in the description ruled Gross out as the actual bank robber, we would still find this search permissible. The police had clear and convincing grounds (probable cause and more!) for believing that the bank robber (whatever his name might be) had entered Billy Kirtdoll's car and been transported to Henry Gross' house just a few moments ahead of their arrival. They also had probable cause to believe that the car and at least the adults in it were involved in the get-away plans of the robber and, hence, were accessories to the crime.[1]

On reaching the second floor, the wet shoes with the distinctive heels (which proved not to belong to Gross) provided probable cause for search for and arrest of Holland, the other felon. The limited searches which followed the two lawful arrests were well within the *Chimel* doctrine. Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).

1. Kirtdoll's presence at his own home and his failure to indicate any use of force by the bank robber in procuring transportation, of course, negated any idea that the car had been commandeered.

Finally, the appellant contends that the police on arrival at the Gross home and being refused admittance should have maintained surveillance and dispatched some part of their force for an arrest or search warrant. Under the circumstances of this case, we do not agree that this procedure was mandated by the Federal Constitution. The police had positive knowledge that a violent crime had been committed, and clear and convincing information that an armed bandit had been brought to the Gross home. They had reason to feel that the noise heard upstairs tended to confirm the robber's presence, even though Gross' sister denied his presence. The police forces available were relatively small and there is no indication that the officers could have taken cover in safety against the possibility that the perpetrators of the crime might decide to shoot their way out. Alternatively, they had reason not to want the bandit or bandits to have time to plan a last ditch defense against the police entrance which they now knew was inevitable.

The essential facts of Warden v. Hayden, *supra*, were described by the Supreme Court as follows:

About 8 a. m. on March 17, 1962, an armed robber entered the business premises of the Diamond Cab Company in Baltimore, Maryland. He took some $363 and ran. Two cab drivers in the vicinity, attracted by shouts of "Holdup," followed the man to 2111 Cocoa Lane. One driver notified the company dispatcher by radio that the man was a Negro about 5'8" tall, wearing a light cap and dark jacket, and that he had entered the house on Cocoa Lane. The dispatcher relayed the information to police who were proceeding to the scene of the robbery. Within minutes, police arrived at the house in a number of patrol cars. An officer knocked and announced their presence. Mrs. Hayden answered, and the officers told her they believed that a robber had entered the house, and asked to search the house. She offered no objection.

The officers spread out through the first and second floors and the cellar in search of the robber. Hayden was found in an upstairs bedroom feigning sleep. He was arrested when the officers on the first floor and in the cellar reported that no other man was in the house. Meanwhile an officer was attracted to an adjoining bathroom by the noise of running water, and discovered a shotgun and a pistol in a flush tank; another officer who, according to the District Court, "was searching the cellar for a man or the money" found in a washing machine a jacket and trousers of the type the fleeing man was said to have worn. A clip of ammunition for the pistol and a cap were found under the mattress of Hayden's bed, and ammunition for the shotgun was found in a bureau drawer in Hayden's room. All these items of evidence were introduced against respondent at this trial. Warden v. Hayden, 387 U.S. 294, 297–98, 87 S.Ct. 1642, 1645, 18 L.Ed.2d 782 (1967). (Footnote omitted.)

While the Supreme Court noted that Mrs. Hayden "offered no objection" to the entrance of the police, neither did she give consent. And the Supreme Court did not treat the case as one based upon consent to search. On the contrary, the rationale of the decision (relating to the large city of Baltimore, Maryland) was based upon the need for speedy apprehension of the robber and the securing of his weapon, as shown in the holding quoted below:

We agree with the Court of Appeals that neither the entry without warrant to search for the robber, nor the search for him without warrant was invalid. Under the circumstances of this case, "the exigencies of the situation made that course imperative." McDonald v. United States, 335 U.S. 451, 456, [69 S.Ct. 191, 193, 93 L.Ed. 153.] The police were informed that an armed robbery had taken place, and that the suspect had entered 2111 Cocoa Lane less than five minutes before they reached it. They acted reason-

ably when they entered the house and began to search for a man of the description they had been given and for weapons which he had used in the robbery or might use against them. The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others. Speed here was essential, and only a thorough search of the house for persons and weapons could have insured that Hayden was the only man present and that the police had control of all weapons which could be used against them or to effect an escape. Warden v. Hayden, *supra* at 298–99, 87 S.Ct. at 1645.

We believe that the two sentences immediately above are directly applicable to the facts of our instant appeal. The facts we have detailed represented "exigent circumstances" which invoked the "hot pursuit" exception to the Fourth Amendment warrant requirement. We believe the District Judge was correct in holding that this case was within the ambit of the Warden v. Hayden holding.

Some brief comment is warranted by Judge McCree's dissent. As indicated above, we feel the facts herein fell within the *Hayden* "hot pursuit" rationale; but the case is close enough to allow for some reasonable concern about that conclusion. We observe, however, that we regard this case as very near the outer perimeter of the *Hayden* doctrine, albeit still within it.

The dissent does, however, contain inaccurate assertions or implications as to distinctions between this case and the *Hayden* case. Hayden was not a stranger to the house there searched as the dissent implies. Hayden lived there. Also, the Supreme Court did not find that police entry into the Hayden house was "with the consent of the owner of the home." Further, the search for Gross and Holland in the instant case was obviously (as in *Hayden*) founded upon probable cause to believe that the two men sought were feloniously involved in the bank robbery. Finally, the search without warrant following the arrests was incident to the lawful arrests. (*See Chimel, supra*).

The judgment of the District Court is affirmed.

McCREE, Circuit Judge (dissenting).

I respectfully dissent. Although I agree with the observation that the performance of the police officers constituted good police work, I do not agree that the search, in the absence of a warrant, was permissible under the Fourth Amendment as interpreted in Warden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967). That case has come to stand for the principle that the immediate uninterrupted pursuit of a fleeing felon from the scene of a crime to a dwelling house furnishes the exigent circumstances excusing compliance with the constitutional requirement of obtaining a warrant before searching the home. In that case, two drivers of radio equipped taxi cabs followed a fleeing and armed felon from the scene of the robbery of their office to a private household, and kept him under surveillance until he entered. The police, who had been summoned during the pursuit, arrived at the home within minutes of the call. Based upon their certainty, confirmed by eyewitness information that the felon was inside and that he was armed and dangerous, and acting upon their reasonable belief that delay would endanger their lives and the lives of possible occupants of the home, the police entered, apparently with the consent of the owner of the home, in order to search. In upholding the validity of the search without a warrant and discounting the element of consent, the Supreme Court stated:

> The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others. Speed here was essential, and only a thorough search of the house for persons and weapons could have insured that Hayden was the only man present and that the police had control of all weapons which could be used against them or to effect an escape.

387 U.S. at 298–99, 87 S.Ct. at 1646.

In this appeal, however, no one pursued the felon and kept him under uninterrupted surveillance at close range from the scene of the bank robbery; no one told the police that the felon had entered the Gross home; and the person who answered the door at the home informed the police that Gross was not home and refused permission to enter. Moreover, if, as the police testified, they suspected that Gross was the bank robber, a belief that the occupants of the Gross home were in danger would not be reasonable. Accordingly, although the suspicions of the police officers about the flight of the felon into the Gross home turned out to be correct, they were not in hot pursuit. They were not engaged in an immediate and close chase of a felon from the scene of the crime to the place where he attempted to hide. Moreover, if the police were seeking Henry Gross, who was an occupant of the home and not a stranger to it, their safety and that of the Gross family would have been better protected had the police, who were present in sufficient numbers, surrounded the house and sought a warrant instead of forcing entry over the protest of Gross' sister and endangering the numerous small children observed in the living room.

Moreover, the determination that exigent circumstances excusing compliance with the warrant requirement of the Fourth Amendment exist does not establish probable cause or obviate the requirement that it be demonstrated. The Supreme Court, in its consideration of the search in Warden v. Hayden, did not address the question whether probable cause to search existed perhaps because the proofs were so convincing that it assumed that probable cause was afforded. In this appeal, the court does not consider whether there was probable cause to search even though appellant argues that the search was invalid for that reason. At best, the question of the existence of probable cause is close because the description of the robber's height that was furnished by eyewitnesses differed significantly from Gross' height which was known to the police officers who were investigating the case, and the other descriptive details did not correspond with particularity to other police information about Gross. The very fact that eyewitness descriptions based on observations made under stress are often inaccurate argues for the dispassionate consideration by a magistrate of an application for a search warrant when there is no emergency.

The majority opinion in this case extends the concept of hot pursuit beyond the facts and rationale of Warden v. Hayden. I fear it would justify the search of a home without a warrant at any time after contact with a fleeing felon is lost if the police succeed in picking up the scent and return to the trail. This result would extend the holding of Warden v. Hayden impermissibly and would severely undercut the protection afforded by the Fourth Amendment. I would reverse and remand for a new trial at which evidence seized in the house would be suppressed.[1]

---

1. The government has not raised the question of Holland's standing to question the legality of the search. That issue may still be open.