[No. 2778–2. Division Two. July 18, 1978.]

THE STATE OF WASHINGTON, *Respondent,* v. WILLIAM EDWARD GALLO, *Appellant.*

718

*Michael H. Hicks,* for appellant (appointed counsel for appeal).

*James E. Carty, Prosecuting Attorney,* and *James Peters, Deputy,* for respondent.

SOULE, J.—The defendant, William Gallo, was convicted by a jury of first–degree assault in Clark County Superior

Court. On appeal to this court, the defendant presents six assignments of error: (1) the trial court's failure to suppress a derringer as having been the product of an unlawful search; (2) the admission of testimony as to conversations overheard by the victim on the night preceding the shooting; (3) the admission of testimony by a police officer that a derringer filled with birdshot "could be" lethal; (4) the denial of defendant's motion to dismiss which was made at the close of the State's case; (5) the denial of defendant's motion in arrest of judgment or for new trial; and (6) the failure of the trial court to instruct the jury that it must be unanimous as to the manner in which the crime had been committed. We find the defendant's contentions to be without merit and therefore affirm the rulings of the trial court.

At 5:30 a.m. on December 7, 1976, Barbara Johnson and her fiance, Dane Walla, were awakened by a disturbance outside their bedroom window. The noise was coming from in front of the house next door and sounded as if someone was being beaten. She heard a voice say that he had a gun and would use it. Another party responded, "No, Billy; no Billy, don't." Although Ms. Johnson looked outside, she was unable to see anyone. However, she did hear someone say: "That girl saw us," and the other responded that they would take care of it. Despite this remark, which she took to be a threat, the police were not notified.

The following morning Mr. Walla left for work. Immediately thereafter, Ms. Johnson heard the doorknob rattling back and forth. When she asked who it was, the rattling stopped. She once again inquired and a voice responded, "Hi, it's your neighbor." As she opened the door to peek outside, defendant walked into her apartment and sat down on the couch. He identified himself as "Bill" and began a friendly conversation with Ms. Johnson about a variety of topics. During this conversation, he mentioned that he was carrying a gun. Alarmed by this, Ms. Johnson quickly informed him that she was expecting her parents at any moment and began to get ready to leave. Defendant

responded by turning off the lights and attempting to kiss her. She resisted these advances and tried to leave the apartment by running towards the outside door. Defendant caught her and began choking her. He then placed a der-ringer to her head and began pushing her upstairs to the bedroom. As they went upstairs, he told her that he didn't want to hurt her, but he would if necessary.

In the bedroom, he made further sexual advances towards her, but she ran towards the door and screamed. Again he was able to catch her, and striking her with his hand he called her a "bitch." She broke free and ran towards the bed, intending to hide under it. As she crouched next to the bed, she could see the defendant about 5 feet away, pointing the gun towards her. She managed to cover her head with her hands before the gun discharged. She was struck in the hands and head with the birdshot pellets the derringer contained.

After a few minutes, she saw he was gone and she telephoned the police. Upon their arrival, she gave the police a brief description of the assailant, told them that his name was "Bill" and that he had gone to the house next door where he resided. This latter information was apparently concluded by Ms. Johnson from various things which "Bill" had said during their conversation. Armed with this information, the police went to this house where they discovered two apartments on the ground floor. After talking with the tenant of the first apartment, they learned that a person named "Bill" lived in the other ground floor apartment. The police then knocked on this apartment's door several times. Each time they identified themselves as police officers and asked for "Bill" to come out. After having waited a couple of minutes, they heard a noise that sounded as if something was being dragged across the floor. Upon hearing this, the police forced their way in and found a person lying on a mattress on the floor of the front room as if asleep. This individual was taken outside where the victim informed the police that he was not the assailant. At this

time Ms. Johnson remembered that the assailant had tattoos on his arms and so told the police. The officers reentered the apartment and found the defendant hiding in a small closet. Since he matched the description given by the victim, he was arrested and searched. In defendant's pocket the police found a 2–shot derringer with one live shell and one spent shell. The live shell contained birdshot. The total time elapsed from the time the police received the call until the time of the arrest was between 10 and 20 minutes.

The primary issue raised on appeal is the denial of defendant's motion to suppress the derringer as being the product of an illegal search. Defendant has raised several challenges to the validity of the search. Initially he challenged the search based on the lack of a warrant as well as the alleged lack of probable cause to support the officer's action.

Although warrantless searches and seizures are prima facie suspect, they will be upheld if the exigencies of the situation are such as to make the foregoing of a warrant imperative. *Warden of Md. Penitentiary v. Hayden,* 387 U.S. 294, 18 L. Ed. 2d 782, 87 S. Ct. 1642 (1967); *McDonald v. United States,* 335 U.S. 451, 93 L. Ed. 153, 69 S. Ct. 191 (1948); *State v. Smith,* 88 Wn.2d 127, 559 P.2d 970 (1977). Such an exigent situation has been recognized to exist where a violent crime has been committed and there is no time to delay the search for the suspect due to the possible danger to either the lives of the police officers or of others, or due to the danger of his escape with the aid of a weapon. *Warden of Md. Penitentiary v. Hayden, supra; United States v. Holland,* 511 F.2d 38 (6th Cir. 1975); *United States v. Shye,* 492 F.2d 886 (6th Cir. 1974). In applying these rules of law to the case at hand, we note that the police received the telephone call from the victim at 9:06 a.m. and were told that she had just been shot. Upon arriving at the scene just a few minutes later, the officers were told that the assailant, "Bill," had gone to his apartment in the house immediately to the south of her residence. In

light of the timing, we have no hesitancy in saying that circumstances made it imperative that the officers act quickly so as to prevent the possibility of further bloodshed or escape.[1] We hold that the requirement of a search warrant was excused by the exigencies of this situation.

Although exigent circumstances may excuse the necessity of a warrant, the search must, nevertheless, be founded upon probable cause. *State v. Smith, supra.* We find that probable cause existed so as to permit the initial entry into defendant's apartment. The information provided by the victim when considered with the neighbor's identification of the apartment as belonging to "Bill," certainly provided the police with a well–founded reason for believing that the assailant could be found within the defendant's apartment. *United States v. Scott,* 520 F.2d 697 (9th Cir. 1975).

The second challenge to the search is based upon the alleged failure of the police to comply with the statutory "knock and wait" rule, RCW 10.31.040. Under that statute, the police, in carrying out a search, must give notice of their office and purpose and may only make a forcible entry upon refusal of their demand.[2] Defendant's challenge is without merit. The police identified themselves as such and expressed their desire for "Bill" to come out. Although the police repeatedly knocked and announced their office and purpose, there was no response. When the sound of something being dragged across the floor was ultimately heard, the police were justified, under the circumstances, in

---

[1]*Warden of Md. Penitentiary v. Hayden,* 387 U.S. 294, 18 L. Ed. 2d 782, 87 S. Ct. 1642 (1967) presents a similar fact pattern. *United States v. Holland,* 511 F.2d 38 (6th Cir. 1975), also on similar facts held that the action of the police was justified by the "hot pursuit" exception to the Fourth Amendment despite the lack of initial eyeball contact by the police.

[2]RCW 10.31.040 states:

"Officer may break and enter. To make an arrest in criminal actions, the officer may break open any outer or inner door, or windows of a dwelling house or other building, or any other inclosure, if, after notice of his office and purpose, he be refused admittance."

*State v. Miller,* 7 Wn. App. 414, 499 P.2d 241 (1972) held the statute to be applicable to searches.

believing that their entry was being refused. The noise also provided a basis for the belief that either an escape was being attempted or some fortification was being erected so as to resist arrest. Therefore, the forcible entry was also justified by the escape exception to the "knock and wait" rule. *Warden of Md. Penitentiary v. Hayden, supra. See State v. Young,* 76 Wn.2d 212, 455 P.2d 595 (1969). Furthermore, in light of the officers' reasonable belief that the assailant was within the apartment and that he had just shot someone, the officers were justified in making a forcible entry for their own protection when the noise from within the apartment clearly indicated the presence of a suspect thought to be armed. *State v. Wilson,* 9 Wn. App. 909, 515 P.2d 832 (1973); and *compare State v. Toliver,* 5 Wn. App. 321, 487 P.2d 264 (1971) *with State v. Johnson,* 11 Wn. App. 311, 522 P.2d 1179 (1974).

Defendant also alleges that the reentry constituted a second search and as such it lacked the necessary probable cause. The latter contention is based upon the theory that since the *first* person seized in the apartment was named "Bill" and since the victim admitted that he was not the assailant, the police, thereafter, had no probable cause to conduct a second search of the apartment.

This theory for suppression was not raised in the court below, and generally issues raised for the first time on appeal are not subject to review. *State v. Talley,* 14 Wn. App. 484, 543 P.2d 348 (1975). However, the defendant did make a general challenge to this evidence at the suppression hearing, and it is not necessary to point out the precise defect in order to secure review of an alleged invasion of a constitutional right. *State v. Vining,* 2 Wn. App. 802, 472 P.2d 564, 53 A.L.R.3d 390 (1970) and *State v. Talley, supra. But see State v. Richard,* 4 Wn. App. 415, 482 P.2d 343 (1971). Defendant's argument assumes that the officers were aware that the *first* individual's name was "Bill." There is nothing in the record of the suppression hearing

which would indicate that the police had any such knowledge. This is due, undoubtedly, to the fact that this contention was not made in the court below. However, assuming arguendo that the police did know that the name of the first individual was "Bill," that knowledge is immaterial in view of our perception of the reasons for the search.

Turning to the contention that the reentry was a second search, we recognize that second or repetitive searches have been characterized as unreasonable, particularly when the second search is for matters unrelated to the subject matter of the first search. *McNear v. Rhay,* 65 Wn.2d 530, 398 P.2d 732 (1965). Nevertheless, a search may be momentarily interrupted and still be of a continuous nature. *Little v. Rhay,* 68 Wn.2d 353, 413 P.2d 15 (1966); *State v. Patterson,* 8 Wn. App. 177, 504 P.2d 1197 (1973). Whether the search can be characterized as a continuation of the first depends upon the facts of each case. *Little v. Rhay, supra.* Factors which have been considered to be important in characterizing a reentry are: (1) whether the reentry search was conducted by the same officers; (2) whether the reentry had the same objective as the initial search; and (3) whether the time interval between the searches suggests an abandonment or completion of the initial search.

Applying these criteria to the case at hand, we note that the same officers conducted the searches of the apartment and the objective of the search at all times remained the *assailant* "Bill." Further, the time expired between the initial seizure and the reentry was merely a matter of minutes and therefore does not suggest an abandonment of the search. We hold that the police officers conducted this search continuously.

In light of the continuous nature of the search,[3] defendant's argument as to the lack of probable cause

---

[3]Since we find the search to have been a continuous search, we need not consider defendant's contention that the police failed to knock and wait before the reentry.

merely pertains to whether the knowledge by the police that one "Bill" had been found, would have dissipated the probable cause to the extent that the police officers were no longer justified in continuing the search. In determining whether such a dissipation had occurred, we must be mindful of the fact that probable cause merely requires a *likelihood* that the object of the search will be found in the apartment and not a prima facie showing. *State v. Patterson*, 83 Wn.2d 49, 515 P.2d 496 (1973).

The victim had told the police that her assailant's name was "Bill" and that he had gone to his apartment in the house next door. Upon arrival at that house, they learned that a person named "Bill" lived in the neighboring ground floor apartment. The officers repeatedly knocked on the door to this apartment and announced their identity and purpose. Although someone was subsequently heard moving an item across the floor, no one answered the door. Upon entering the apartment, an individual was found apparently asleep in the front room. From the facts known to the police, they could have properly concluded that another individual was responsible for the noise heard and had refused entry to the police. Also, by this time they had learned that the object of their search had tattoos. In light of these circumstances, the mere fact that the police may have learned that the sleeping individual's name was "Bill" (not an uncommon name) does not dissipate the existence of probable cause, especially in light of the exigencies of the situation. We hold that the officers were justified in continuing the search.

The police were thus properly on the premises when they discovered the defendant hiding in the closet. Since the defendant's physical characteristics and the apartment in which he was hiding coincided with the information provided by the victim, the police were in possession of sufficient facts as would have caused a cautious but

disinterested person to believe the defendant had committed the felony. A warrantless arrest based upon such probable cause is lawful. *State v. Darst,* 65 Wn.2d 808, 399 P.2d 618 (1965). Further, since the derringer was the product of a lawful search incident to this arrest, the trial court did not err in denying defendant's motion to suppress.

■ The second assignment of error is the admissibility of the victim's testimony concerning the conversation which she overheard the night before the shooting. Since neither Ms. Johnson nor Mr. Walla was able to identify the defendant, either by voice or by sight, as a participant in the conversation, defendant contends that the testimony was irrelevant as well as prejudicial. While it is true that there must be some authentication of the conversation before it is admissible, the evidence used to identify the speaker need only be circumstantial. *State v. Bates,* 52 Wn.2d 207, 324 P.2d 810 (1958); *State v. Deaver,* 6 Wn. App. 216, 491 P.2d 1363 (1971); *State v. Elie,* 4 Wn. App. 352, 481 P.2d 464 (1971). The subsequent actions of the defendant in appearing at the victim's door immediately after her boyfriend had left, the identity of names of defendant and the speaker, and the resulting attack upon the victim, certainly tend to identify the defendant as the individual who made the threat, at least for the purposes of authentication. *See State v. Peterson,* 109 Wash. 25, 186 P. 264, 8 A.L.R. 652 (1919).

■ Since there was sufficient authentication and the evidence was capable of throwing some light upon the motive for the shooting as well as the intent, it was relevant and therefore admissible. *Roberts v. Atlantic Richfield Co.,* 88 Wn.2d 887, 568 P.2d 764 (1977). Evidence which is relevant will only be excluded if its relevancy is remote, its necessity slight and its inflammatory effect substantial. *State v. Smith,* 5 Wn. App. 237, 487 P.2d 227 (1971). The determination of the inflammatory effect of the evidence is left to the discretion of the trial court and will not be reviewed on appeal except for an abuse of that discretion.

*State v. Smith, supra.* No showing of an abuse has been made in this case.

The defendant's third assignment of error concerns the trial court's permitting Sgt. Finn to testify that the derringer, when filled with birdshot, "could be" lethal.

Defendant argues that Sgt. Finn was not a qualified expert and did not base his opinion on facts in the record. The competency of a witness to testify as an expert is addressed to the sound discretion of the trial court. *State v. Shaffer,* 18 Wn. App. 652, 571 P.2d 220 (1977). The witness was an experienced police officer, familiar generally with guns, and testified that he was familiar with this weapon. We find no abuse of discretion.

An independent procedural reason exists for rejecting the claimed error. Although defendant did object to this testimony, the objection was made only after the witness had already answered the question. An objection which comes after the witness has answered is not timely unless there was no opportunity to object or it was not apparent from the question that the answer would be inadmissible. *State v. Richard, supra.* The trial court in ruling on the objection indicated that the objection was not timely and we agree. Moreover, were we to consider the objection to have been timely, the issue would still not be considered on this appeal since the objection was not accompanied by a motion to strike. *State v. Jones,* 70 Wn.2d 591, 424 P.2d 665 (1967). *State v. Richard, supra.*

Similarly, defendant's assignment of error to the trial court's denial of his motion to dismiss at the close of the State's case cannot be considered on this appeal. By putting on evidence in his own behalf after the denial of that motion, defendant waived his challenge to the sufficiency of the State's evidence. *State v. Allan,* 88 Wn.2d 394, 562 P.2d 632 (1977).

After the jury returned a verdict of guilty, the defendant moved for an arrest of judgment and for a new trial on the basis that there was insufficient evidence of an intent to kill. In reviewing the sufficiency of the evidence,

an appellate court must view the evidence and the inferences therefrom in a light most favorable to the State, and must uphold the jury's verdict if there is substantial evidence to support the finding of an intent to kill. *State v. Randecker,* 79 Wn.2d 512, 487 P.2d 1295 (1971); *State v. Metcalf,* 14 Wn. App. 232, 540 P.2d 459 (1975). Substantial evidence is said to exist where the evidence is such as would convince an unprejudiced thinking mind of the existence of the fact to which the evidence is directed. *State v. Hall,* 13 Wn. App. 620, 536 P.2d 680 (1975).

 Intent is rarely provable by direct evidence, but may be gathered, nevertheless, from all of the circumstances surrounding the event. *State v. Shelton,* 71 Wn.2d 838, 431 P.2d 201 (1967). Viewing the evidence according to the above standards, we find that only hours before the shooting defendant had threatened "to take care of" the victim; during the attack he threatened to hurt her if she failed to cooperate; and the defendant took careful aim before shooting her in the head. This is certainly substantial evidence upon which the jury could have found an intent to kill. The mere fact that the defendant fired at the victim has been held to justify a finding of such an intent. *State v. Odom,* 83 Wn.2d 541, 520 P.2d 152 (1974).

 Defendant's reliance upon the use of birdshot as negating intent to kill is without merit. In *State v. Hart,* 118 Wash. 114, 203 P. 4 (1921), the defendant had fired a shotgun filled with birdshot at the victim from a distance of between 72 and 97 feet. The defendant there made the similar contention that the use of birdshot negated the intent to kill. The court upheld the conviction stating at page 115:

> all the conduct of the appellant, and the circumstances as shown by the evidence, gave the jury adequate reason for determining that the appellant's heart was set upon slaughter, and the less serious consequences of his act was the result of the necessities of the occasion, rather than of the appellant's fine feeling and kindly consideration.

The trial court properly denied defendant's motion for arrest of judgment and for new trial.

 The final assignment of error concerns the instructions given to the jury. Defendant contends that it was error to instruct the jury as to alternative methods of committing the crime without requiring the jury to be unanimous in the verdict as to the method used in the commission of the crime. Defendant failed to object to the instructions given and this contention is also entirely without merit. Where, as here, a single offense may be committed by various means, the jury need only be unanimous as to the guilt of the defendant and not as to the manner in which the offense was committed, provided there is substantial evidence to support each of the means charged. *State v. Arndt*, 87 Wn.2d 374, 553 P.2d 1328 (1976). The jury was instructed that the assault must have been committed with the use of either: (1) a firearm; (2) a deadly weapon; or (3) means likely to produce death. Although the defendant does not argue in this assignment of error that any of these means were unsupported by substantial evidence, we find that such support existed for each method instructed.

The conviction of defendant for first–degree assault is affirmed.

REED, A.C.J., and PETRIE, J., concur.

Reconsideration denied August 7, 1978.

Review denied by Supreme Court December 14, 1978.