IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 31997-1-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| ALAN ROSS HACKNEY, | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, J. — Alan Hackney appeals his conviction for assault of a

child in the second degree. He argues the State failed to present sufficient evidence to

sustain the intent element of his assault conviction. We disagree and affirm.

## FACTS

In December 2012, 20-year-old Alan Hackney and 18-year-old Robin Herald had a

daughter, S.H., after having dated for several years. The family lived with Ms. Herald's

mother. In early January 2013, S.H. had thrush, a urinary tract infection, and a fever.

Consequently, S.H. was sleeping poorly and would wake up screaming in the middle of

the night.

The night of January 3, 2013, Ms. Herald slept downstairs with S.H. to avoid disturbing her mother and Mr. Hackney, who both worked the next morning. At roughly 5:30 a.m. on January 4, Ms. Herald went and asked Mr. Hackney to help her care for S.H. Mr. Hackney cared for S.H., and Ms. Herald went upstairs to her bedroom and went to sleep. Ms. Herald awoke at 9:00 a.m. and "heard a very different cry." Report of Proceedings (RP) at 43. Ms. Herald looked down the stairs and asked Mr. Hackney if everything was all right, and Mr. Hackney said S.H. was crying, she would not take a bottle, and her head was swollen. S.H. also had four oval-shaped bruises on her forehead, two oval-shaped bruises on her arm, and red petechial bruising on her neck.[1] Ms. Herald asked Mr. Hackney if he did something to S.H. Mr. Hackney denied harming S.H.

Ms. Herald and Mr. Hackney took S.H. to Walla Walla General Hospital, where Dr. Elizabeth McMurtry, the emergency room physician, examined her. Dr. McMurtry ordered a computerized tomography (CT) scan of S.H.'s head, which revealed two fractures on the sides of her skull. The CT scan also revealed a small subdural hematoma—a pocket of blood—on S.H.'s skull. Dr. McMurtry asked Ms. Herald and Mr. Hackney how S.H.'s injuries occurred. Ms. Herald did not know, so she told Dr. McMurtry that S.H. could have possibly hit her head on the back of her changing table.

---

[1] Petechial bruising looks like point red dots on the skin and is typically caused by

2

Mr. Hackney told Dr. McMurtry that he did not know how S.H.'s injuries occurred. Dr. McMurtry made a referral to Child Protective Services (CPS), and CPS investigator James Hatley went to Walla Walla General to investigate S.H.'s injuries. Ms. Herald and Mr. Hackney both told Mr. Hatley they did not know how S.H.'s injuries occurred.

Walla Walla General transported S.H. in an ambulance to Sacred Heart Medical Center in Spokane. Dr. Ryan Baker admitted her at Sacred Heart that night. Dr. Karina Dierks examined her on January 5, and Dr. Michelle Messer—a pediatric hospitalist specializing in child abuse—examined her on January 6. In addition to the skull fractures and hematoma, Dr. Baker, Dr. Dierks, and Dr. Messer also noted S.H.'s forehead bruises, the petechial rash around her neck, a bruise inside her elbow, a bruise on the back of her arm, and swelling on her scalp. The doctors asked how S.H.'s injuries occurred, and Ms. Herald restated that S.H. could have hit her head on the changing table. Mr. Hackney maintained that he did not know. Dr. David Gruber, a neurosurgeon, reviewed S.H.'s CT scans and concluded surgery was unnecessary to repair her skull fractures.

While Ms. Herald was at Sacred Heart on January 6, Dr. Messer told Ms. Herald that the story about S.H. hitting her head on the changing table was inconsistent with S.H.'s injuries, and she was recommending that CPS place S.H. in foster care. Ms.

---

capillaries breaking when there is trauma to the tissue.

3

Herald then called Mr. Hackney, who had gone back to Walla Walla for work. Ms. Herald told Mr. Hackney that CPS and the doctors needed a better explanation for S.H.'s injuries. Mr. Hackney admitted to Ms. Herald that he tripped while holding S.H. and accidentally dropped her on her head from one foot above the floor.[2] Ms. Herald said, "'Well, you need to tell somebody.'" RP at 273. Mr. Hackney then called Mr. Hatley and left him a voicemail. In the voicemail, Mr. Hackney admitted the story about S.H. hitting her head against the changing table was not true, that he had dropped S.H. about one foot, and that was how S.H.'s injuries occurred.

Mr. Hatley told Detective Marcus Goodwater about Mr. Hackney's voicemail. In light of this new information, Detective Goodwater called Mr. Hackney and asked him to come to the police station for an interview. Throughout the interview, Mr. Hackney acknowledged he dropped S.H. "hard," but maintained he dropped her accidentally. Clerk's Papers (CP) at 107. Mr. Hackney stated that after he fractured S.H.'s skull, he attempted to reposition the skull back into place with his hands and that is what caused the bruises in S.H.'s forehead. Eventually, Detective Goodwater accused Mr. Hackney of purposely dropping S.H. Detective Goodwater stated, "Just this one moment, just the lack of sleep, all this frustration of life came down on this one moment. Just the

---

[2] Mr. Hackney later told Ms. Herald that he dropped S.H. from a standing position.

4

mountain just came crushing down on you, and she just happened to be in your arm. . . . That's what happened." CP at 111-12. Mr. Hackney nodded his head during Detective Goodwater's accusation, but never verbally agreed that he intentionally dropped S.H. Several minutes later, Mr. Hackney said, "I can tell you that her dropping, yeah, I was frustrated, and I dropped her." CP at 114. Detective Goodwater interpreted Mr. Hackney's nod and subsequent statement as a confession that he had intentionally thrown S.H. to the floor and relayed this conclusion to the prosecuting attorney.

The State charged Mr. Hackney with second degree assault of a child and domestic violence. At trial, the three doctors the State called testified S.H. could not have sustained her injuries from hitting her head against her changing table because a one-month-old child cannot generate enough force from throwing his or her body around to fracture bone. Dr. Messer testified that the oval-shaped bruises on S.H.'s forehead and arms were fingerprints, and were "left with a forceful hold or grabbing fingers."[3] RP at 199.

---

[3] It was disputed at trial whether S.H.'s arm bruises existed before January 4—Ms. Herald testified S.H. did not have arm bruises before January 4, whereas Mr. Hackney testified S.H.'s arm bruises existed before January 4. Dr. Messer testified that it is impossible to date bruises. On review, this court assumes the truth of the State's evidence.

5

The State also questioned Dr. Dierks, Dr. Baker, and Dr. Messer about S.H.'s petechial bruising. Dr. Dierks testified that petechial bruising can occur on a child's face due to strenuous coughing or vomiting, but it is not typical to see a child S.H.'s age with petechial bruising under his or her neck, and this was a "red flag." RP at 79. Dr. Baker testified petechiae on a person's neck can be caused by either "[f]orceful vomiting or strangulation injuries," but that he had "never seen petechia [sic] on the neck in a 30-day old from vomiting." RP at 151-52. Dr. Messer testified coughing or vomiting could cause petechiae on the face or chest but would not cause petechial bruising that is "limited to the neck." RP at 200. Dr. Messer testified that petechiae in a baby's neck fold is "fairly common for a choke, pressure being placed in that area. So grabbing somebody by the neck will cause those marks in that area." RP at 200.

The State asked its witnesses whether S.H.'s injuries were more consistent with an accidental dropping or intentional abuse. Dr. Dierks testified she had seen skull fractures similar to S.H.'s in her practice and "in infants they are usually in non-accidental trauma cases." RP at 72. However, Dr. Dierks acknowledged she did not have any medical evidence to differentiate between a parent dropping a child on his or her head intentionally from three or four feet versus a parent accidentally dropping that child from the same distance. Dr. Baker similarly testified that a parent "accidentally bonk[ing]" his

6

or her child on something does not generate enough force to fracture the child's skull. RP at 150. Dr. Baker also acknowledged he could "not necessarily" tell whether a parent accidentally or intentionally dropped his or her child, but "this depends on any other injuries that you might note." RP at 154. To this end, Dr. Baker testified that the location of the petechiae on S.H.'s neck, combined with the skull fractures and the bruise, raised concerns that the petechiae were created nonaccidentally. The prosecutor asked Dr. Messer whether her analysis was affected by Mr. Hackney's explanation that he accidentally dropped S.H. In response, Dr. Messer testified:

> [I]f you are standing with a baby and you accidentally drop the baby, and the baby lands on her head, you can fracture the skull that way. And you can get two fractures right where these fractures are that way. However, you don't get the bruising, you don't get the petechiae and you don't get the arm bruise and you tend not to get a subdural hematoma with that, either.

RP at 204. Mr. Hatley also testified that Mr. Hackney's explanation that he dropped S.H. from one foot off the floor "just did not seem consistent with the injuries up around her face, around her neck, her arms. And after consulting with the doctor was not consistent with the skull fracture." RP at 171.

Mr. Hackney testified at trial. He said that he woke up early in the morning on January 4 and heard S.H. crying. He went downstairs and saw S.H. in her car seat next to Ms. Herald, who was asleep on the couch, and he took S.H. upstairs to the changing room

without waking Ms. Herald. He changed S.H. on the changing table, but lost his balance as he was moving S.H. from the table to her blanket on the floor. He "put [his] hands out and [he] fell to the floor above [S.H.], and she hit the ground. And . . . she hit the top of her head." RP at 257. Mr. Hackney then saw "a little bit of a plate of her head sticking out a little bit," and "pressed on it." RP at 259. After rocking S.H. back to sleep, Mr. Hackney took S.H. back downstairs, put her back in her car seat next to Ms. Herald, and then "acted like [he] never actually did anything in the night." RP at 262. Mr. Hackney acknowledged he initially lied about how S.H.'s injuries occurred because he was "more worried about [him]self and getting [his] baby taken away from [him] at the time," that he was not "thinking correctly," and that he felt guilty about having lied. RP at 293, 295. Finally, Mr. Hackney testified that his head nod during his interview with Detective Goodwater was only an acknowledgement the detective made a statement and was not an affirmative response to the detective's accusation: "My nod of the head means all I'm doing is acknowledging that you said something. It's not that I'm agreeing with you. . . . I do that a lot." RP at 278.

Dr. Toomas Eisler testified as an expert for the defense. Dr. Eisler reviewed S.H.'s medical records from both hospitals and concluded that

> the force that caused the injury to [S.H.] was probably of about the strength of a dropping of a baby about a meter off the floor, on to the floor.

8

There is no evidence of collateral damage . . . that would indicate a throwing or even a lobbing of the baby on to the floor.

RP at 314.

The jury convicted Mr. Hackney of second degree assault of a child and also found that the assault was an act of domestic violence. Mr. Hackney appeals.

## ANALYSIS

1. *Standard of review*

In a criminal case, the State must provide sufficient evidence to prove each element of the charged offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 316, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). When a defendant challenges the sufficiency of the evidence, the proper inquiry is "whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). "[A]ll reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant." *Id.* Furthermore, "[a] claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." *Id.*

In a challenge to the sufficiency of the evidence, circumstantial evidence and direct evidence carry equal weight. *State v. Goodman*, 150 Wn.2d 774, 781, 83 P.3d 410

9

(2004). This court's role is not to reweigh the evidence and substitute its judgment for that of the jury. *State v. Green*, 94 Wn.2d 216, 221, 616 P.2d 628 (1980). Instead, because the jurors observed the witnesses testify firsthand, this court defers to the jury's resolution of conflicting testimony, evaluation of witness credibility, and decision regarding the persuasiveness and the appropriate weight to be given the evidence. *State v. Thomas*, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004).

2. *Whether the State presented sufficient evidence to sustain the intent element of Mr. Hackney's second degree assault of a child conviction*

A person commits second degree assault when that person "[i]ntentionally assaults another and thereby recklessly inflicts substantial bodily harm." RCW 9A.36.021(1)(a); *see State v. McKague*, 159 Wn. App. 489, 509, 246 P.3d 558 ("[S]econd degree assault comprises two discrete acts, each with its own mental state—intentional assault and reckless infliction of substantial bodily harm."), *aff'd*, 172 Wn.2d 802, 262 P.3d 1225 (2011). A person commits second degree assault of a child when a person commits the crime of second degree assault, as defined above, on a victim who is less than 13 years old. RCW 9A.36.130. A criminal assault requires intent, which means acting "with the objective or purpose to accomplish a result which constitutes a crime." RCW 9A.08.010(1)(a). "Intent is rarely provable by direct evidence, but may be gathered, nevertheless, from all of the circumstances surrounding the event." *State v.*

10

*Gallo*, 20 Wn. App. 717, 729, 582 P.2d 558 (1978). Further, criminal intent may be inferred "from conduct that plainly indicates such intent as a matter of logical probability." *State v. Abuan*, 161 Wn. App. 135, 155, 257 P.3d 1 (2011).

Here, Mr. Hackney only challenges the sufficiency of the State's evidence insofar as the jury found he acted intentionally. The State's direct evidence of Mr. Hackney's intent was the interview with Detective Goodwater, in which Mr. Hackney nodded when Detective Goodwater accused him of intentionally dropping S.H.[4] Mr. Hackney contends his nod "could have meant many things, most innocuous and non-incriminating, *e.g.*, an acknowledgment by Mr. Hackney that he heard what the detective was saying." Br. of Appellant at 8 (alteration in original). In arguing that his nod was simply an acknowledgment rather than an affirmative answer, Mr. Hackney asks this court to reweigh evidence and substitute its interpretation of Mr. Hackney's nod for the jury's findings. That is not this court's role. Instead, this court reviews the evidence in the light most favorable to the jury's verdict to determine whether any rational trier of fact could

---

[4] The jury watched Detective Goodwater's interview with Mr. Hackney three times: once in its entirety while Detective Goodwater was on the stand, the short segment where Mr. Hackney nodded during the State's closing argument, and once again in its entirety during deliberations.

11

have found Mr. Hackney acted intentionally. Here, a rational jury could have interpreted Mr. Hackney's nod as an affirmative response to Detective Goodwater's accusation.

Additional direct evidence of Mr. Hackney's intent was his statement later in the interview: "I can tell you that her dropping, yeah, I was frustrated, and I dropped her." CP at 114. Although Mr. Hackney goes on to say that he did not intend to *hurt* S.H., the statute does not require the State to prove that Mr. Hackney intended the actual harm—RCW 9A.36.021(1)(a) only requires the State to prove that Mr. Hackney intended the *assault*, i.e., the drop, and was reckless as to the resulting harm. *See McKague*, 159 Wn. App. at 509.

The State also introduced circumstantial evidence of Mr. Hackney's criminal intent through its expert witnesses, which carries the same weight as direct evidence. Dr. Messer testified that the fingerprint bruises on S.H.'s arms and forehead were "left with a forceful hold or grabbing fingers," and the petechial bruising on her neck is "fairly common for a choke . . . . So grabbing somebody by the neck will cause those marks in that area." RP at 199-200. Dr. Dierks testified that skull fractures similar to S.H.'s "are usually in non-accidental trauma cases." RP at 72. Dr. Baker, Dr. Messer, and Mr. Hatley all testified that the constellation of S.H.'s injuries—the skull fracture, the forehead and arm bruises, the neck petechiae, and the subdural hematoma—raised

12

concerns that the injuries were created nonaccidentally. Although Mr. Hackney testified that he dropped S.H. accidentally and presented expert evidence to support this contention, the jury discredited the defense's evidence and found the testimony of the State's experts credible. Accordingly, viewed in the light most favorable to the State, and drawing all reasonable inferences in favor of the State, we conclude that the foregoing evidence was sufficient to permit a rational trier of fact to find, beyond a reasonable doubt, that Mr. Hackney intentionally assaulted S.H.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Lawrence-Berrey, J.

WE CONCUR:

Siddoway, C.J.          Fearing, J.

13